## Ex Parte W. H. Townsend.

### No. 1586.     Decided December 20, 1911.

### Rehearing Denied February 28, 1912.

**1.—Occupation Tax—Nonintoxicating Malt Liquors—Constitutional Law.**

The Act of the Legislature, chapter 19, page 51, Thirty-first Legislature, imposing a tax upon those engaged in selling nonintoxicating malt liquors is constitutional. Davidson, Presiding Judge, dissenting.

**2.—Same—Police Power—Constitutional Law.**

The right to regulate or prohibit an occupation which endangers the health, morals or safety of the people is included within the police power of the Legislature, and is inherent thereto without a specific constitutional grant, except when limited by the Constitution.

**3.—Same—Malt Liquors—Hiawatha.**

Malt liquor is an alcoholic liquor, and the Legislature has the right under the police power to regulate the same, although it is not an intoxicating liquor, and the Legislature may assume that the same is injurious to the health and morals of the people, and "Hiawatha" is one of these liquors or drinks.

**4.—Same—Constitutional Law—Taxation—Regulation.**

The Act of the Thirty-first Legislature, chapter 19, page 51, imposing a tax upon the sale of nonintoxicating malt liquors, amended the Act of 1907, and is in the nature of a police regulation, or at least, a blending of such regulation and an occupation tax measure. Distinguishing Ex parte Woods, 52 Texas Crim. Rep., 575.

**5.—Same—Power of Legislature—Tax—License—Regulation.**

The Legislature within the police power has full authority to adopt such means of regulation as it desires; and it may be by a system of license and regulation, by a tax laid upon the occupation, or by blending of a tax, license, and regulatory provisions.

**6.—Same—Equal and Uniform Taxation—Constitutional Law.**

The Act of the Thirty-first Legislature, chapter 19, page 51, is not unconstitutional on the ground that it is unequal and not uniform taxation and that it conflicts with the Act regulating the sale of intoxicating liquors, as it does not cover the same class of liquor and is, therefore, not class legislation; there being no constitutional inhibition, the Legislature had the right under the police power to place even a prohibitive tax upon the sale of any articles, which in themselves are harmful or injurious to the health, morals, or general welfare of the people.

**7.—Same—Intoxicating Liquors—Nonintoxicating Liquors.**

The Act of the Thirty-first Legislature, chapter 19, page 51, imposing a tax on the sale of nonintoxicating liquors does not contravene section 20, article 16 of the Constitution, as this deals with intoxicating liquors.

**8.—Same—Uniform Legislation.**

The Act of the Thirty-first Legislature, chapter 19, page 51, imposing a tax on nonintoxicating liquors, applies alike to all persons dealing in this class of liquors prescribed by law and is, therefore, equal and uniform and constitutional. Davidson, Presiding Judge, dissenting.

**9.—Same—Case Stated.**

Where relator was charged with the offense of pursuing the occupation of selling nonintoxicating malt liquors without paying the tax and procuring a license as is provided for in chapter 19, page 51, Act of the Thirty-first Legislature, and by an agreed statement of facts admitted the charge, but claimed that the law is unconstitutional. Held, that he was guilty of a violation of the above law, which is constitutional. Davidson, Presiding Judge, dissenting.

From Orange County.

Original habeas corpus proceeding asking release from commitment under a charge against relator of the offense of pursuing the occupation of selling nonintoxicating malt liquors without paying the tax and procuring the license therefor.

The opinion states the case.

*J. B. Bisland* and *Baker, Botts, Parker & Garwood* and *McGregor & Gaines* and *Jesse Andrews,* for relator.—Cited cases in minority opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—On October 27, 1911, an information was filed by the county attorney in the County Court of Orange County against the relator, W. H. Townsend, charging him with the offense of pursuing the occupation of selling nonintoxicating malt liquors without paying the tax and procuring the license, as is provided for in chapter 19, page 51, Act of the Thirty-First Legislature. The relator was arrested upon said charge and made application to the county judge of Orange County for a writ of habeas corpus. The writ being refused the relator made application to this court and the application was granted by this court. The relator was released on bond and the case is now before this court on said habeas corpus hearing.

There is an agreed statement of facts upon which the case is submitted in which it is shown that all of the proceedings in the County Court were regular, and if this court is of the opinion that the Act of the Legislature above referred to imposing a tax upon those engaged in selling nonintoxicating malt liquors is constitutional, that being the only question presented, it will follow that the relator should be remanded to the custody of the proper official of Orange County. The facts show that the relator was on the date charged by the information engaged in the grocery business in the city of Orange, and in connection with said business he was engaged in the occupation and was selling cold drinks, including ginger ale, ginger pop, soda

water and a malt drink known as "Hiawatha," without having paid the occupation tax required therefor by law, and without having obtained the license required therefor. It is further agreed in so ·far as this case is concerned that "Hiawatha" is a nonintoxicating malt liquor manufactured by the Houston Ice & Brewing Company, of Harris County, Texas; that the Commissioners Court of Orange County has regularly levied a tax of $1,000 on the occupation of selling nonintoxicating malt liquors and that what is known as local option is not in effect in Orange County, there being three malt liquor dealers' licenses issues in said county under what is known as the Robertson-Fitzhugh Act, and· the three places are being operated under said malt liquor dealer's licenses, besides other licenses issued to retail liquor dealers. The relator does not hold a retail liquor dealer or malt dealer's license, and in fact holds no license of any kind to sell either intoxicating or nonintoxicating liquors.

Since this case was submitted in this court the writer has called the attention of the Attorney-General to the pendency of the cause and to the brief and argument filed herein in behalf of relator by his attorneys in which it was stated he made certain concessions. As the case involves the constitutionality of a very important law in this State, and one which was framed to meet the constitutional objections by which a former law on this subject, enacted by the Thirtieth Legislature, was stricken down, and on account of the fact that the brief and argument for relator refers to the views and alleged concessions of the Attorney-General on a vital issue in this case, in support of his contention in maintaining that this law is unconstitutional, we requested the Attorney-General to file a brief and argument setting forth fully the views of the Attorney-General and the Attorney-General's department in support of the constitutionality of the Act of the Legislature in question, if he deemed the law valid, which he assured us he did, and so ably has he and his assistants presented the questions involved, we have adopted the brief and argument as the opinion of the court. He states:

"The relator vigorously attacks the validity of the law on two grounds: (1) Because the amount of the tax imposed is prohibitory and prevents the citizens of the State from engaging in a lawful business; and (2) that the Act has the effect to make the tax on the pursuit of the business named in it unequal and not uniform, persons in those parts of the State where the Robertson-Fitzhugh Law is in effect having to pay one amount of tax for the sale of nonintoxicating malt liquors and persons in the other parts of the State having to pay a different tax.

We shall discuss the constitutional questions above mentioned, ·but before doing so we desire ·to call attention to the . statement contained in relator's brief under the first proposition which, while no doubt inadvertently made, does not in any sense express the views of the Attorney-General, and in justice to himself and his department the

Attorney-General feels called upon to say that he has not in any manner heretofore indicated his views on the questions referred to in said statement. The statement referred to as copied in relator's brief is as follows:

"It is conceded by the Honorable Attorney-General that the Act is prohibitive, that is, that the tax named in it is fixed at such an amount that it would render the conduct of the business in the State unprofitable. That such was indeed the purpose of the Legislature is shown by the subsequent amendment of the Act at the special session, by which the law which had just been passed was so changed, that separate license and another tax was required for each place in the county where the occupation was pursued. It is also conceded by the Attorney-General that nonintoxicating malt liquors are themselves harmless and not deleterious to health."

There is no evidence in the record and no admission to the effect that the tax imposed is prohibitory, and while the tax is comparatively very high, and will no doubt very materially discourage the sale of nonintoxicating malt liquors, we do not think we are warranted in reaching a conclusion that the tax is necessarily absolutely prohibitive.

We do not at all agree with the contention that "nonintoxicating malt liquors are themselves harmless and not deleterious to health." On the other hand, we think the law and facts warrant an exactly opposite conclusion. Our views as to this, however, will be more fully expressed in the discussion of the questions presented.

The Thirtieth Legislature, by chapter 112, page 213, Act of 1907, enacted a law, among other things, placing an annual State tax of $2,000, and authorizing counties and incorporated cities each to levy an annual tax of not exceeding $1,000 upon all persons, firms and corporations "selling at retail nonintoxicating malt liquors, such as Uno, Ino, Tin Top, and Teetotal, and all other such liquors." This law was held to be unconstitutional by this court in the case of Ex parte Woods, 52 Texas Crim. Rep., 575, for the reasons that we shall hereafter mention. The present law passed by the Thirty-First Legislature while covering the same subject as that covered by the Act of 1907, is not an amendment of any previous law, but is an independent enactment. The caption shows that it is an Act to levy an occupation tax on all dealers in nonintoxicating malt liquors, and providing for the issuance of licenses, fixing penalties for the violation of the Act and providing for injunctions to prevent its violation. Section 1 of the Act is as follows:

"There is hereby levied upon all firms, persons, associations of persons and corporations selling nonintoxicating malt liquors an annual State tax of two thousand ($2,000) dollars. Counties, incorporated cities and towns where such sales are made may each levy an annual tax of not exceeding one thousand $(1,000) dollars upon all such persons, firms or corporations; provided that this sec-

Vol. LXIV Crim.—23.

tion shall not prevent the sale of such proprietary remedies as 'malt extract,' 'malt medicine' and 'malt and iron' manufactured and used exclusively as medicine and not as a beverage, when sold upon the prescription of a regular practicing physician; provided further that not more than one sale shall be made upon any one prescription.'

Section 2 of this law was amended by the second called session of the Thirty-First Legislature, as shown by chapter 9, page 397, Acts Thirty-First Legislature, and by section 2, as amended, it is provided that each person, firm or corporation desiring to engage in the business mentioned in section 1 of the Act, before engaging in the same shall file with the county clerk of the county in which the business is proposed to be pursued an application in writing for a license to engage therein, and shall state the place or house in which said business is to be pursued, and if within the corporate limits of any incorporated city or town that fact shall be so stated. The applicant is required to pay the tax collector of the county the entire amount of the tax that is levied by the Commissioners Court, and to the city the tax levied by it. The taxes are required to be paid in advance, and no license shall be issued by the county clerk until the person applying therefor shall exhibit receipts showing the payment of all taxes. It is further provided that it shall be unlawful to carry on the business under such a license at more than one place at the same time. Or in any place other than that named in said application for said license, unless the party carrying on such business shall first file with the county clerk of the county in which said business is carried on a written statement showing such change of place of business.

Section 3 provides that the county clerk shall be required to make report of all licenses issued by the authority of this Act as in other cases.

Section 4 provides a penalty for the violation of this law and makes it a misdemeanor punishable by fine of not less than $100 nor more than $500, and by imprisonment in the county jail for a period of not less than twenty days nor more than ninety days for any person to engage in the business covered by this Act without having procured a license as provided for therein.

Section 5 provides for the issuance of injunctions at the suit of the State against any persons who are engaged in the sale of the liquors covered by this law without having procured a license as therein required.

We shall first consider the contention of relator that the tax imposed is prohibitive; that nonintoxicating malt liquors are harmless and not deleterious to health; and that the Legislature is without authority to regulate, license or prohibit the sale thereof, or to place such a heavy tax burden thereon. It is claimed that the Legislature has no authority to enact this law under the taxing power nor under the inherent police power of the State. This brings us immediately

to what is meant by the police power. It is difficult to find a satisfactory definition to this term, or to very definitely mark its boundaries. Many courts and text-writers have undertaken to define it, and it has been the subject of judicial inquiry from time immemorial. 8th Cyc., page 863, defines it as follows:

"Police power is the name given to that inherent sovereignty which it is the right and duty of the government or its agents to exercise whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires."

Practically all of the definitions include within the police power the right to regulate or prohibit occupations which endanger the health, morals or safety of the people. See Words & Phrases defined, vol. 7, page 5424 et seq. This power is inherent in governments and may be exercised by every sovereign State through its law-making agency, independently of any specific or general grant of constitutional authority. And it may be said that, as to every subject coming within the police power, there is no limitation upon the exercise of the power by the legislative body of a State, except such specific limitations as may be found in the Constitution of the State or of the United States. As the use of intoxicating liquors is well nigh universally acknowledged to be injurious to the health, morals and safety of the people, it has long been conceded that the regulation and prohibition of the manufacture and sale of such liquors are peculiarly within the police power of the several States. Under this theory of government innumerable kinds of regulatory and prohibitive laws have been passed. Some of them amount to absolute prohibition, and many of them impose the most drastic license conditions, and carry with them extremely burdensome license or tax charges. Unless there was a constitutional inhibition, the prohibitive laws have been upheld by the courts, and wherever the regulation measures have any reasonable relation to the evil sought to be destroyed, they have likewise been upheld. We do not understand, however, that relator contends that if the tax in this instance was placed on intoxicating liquors it would be unconstitutional. The contention is that the liquor not being intoxicating is not a proper subject for the exercise of police power; that the very language of the law distinguishes it as nonintoxicating; and further, that because it is nonintoxicating it is harmless and noninjurious to the health, morals and safety of the people. If we concede that nonintoxicating malt liquors are harmless and their use not injurious to the health or morals, there would be great force in relator's contention, but we do not think the facts sustain the contention. On the other hand, we think that nonintoxicating malt liquors may be of such quality as to be extremely injurious and dangerous to the health and morals of the people, and we further think that the Legislature had the right to assume that any

beverage which contains "malt liquors" is injurious to health and morals and thereby subject to the police power. While the majority of these laws are leveled at intoxicating liquors, yet it does not follow that the police power is confined to this class of liquors or that the intoxicating feature is the boundary line over which the Legislature can not pass.

Alcohol is the intoxicating element in all spirituous, vinous, malt and other intoxicating liquors. Joyce on Int. Liq., sec. 17. We think it well established that under the police power the Legislature may regulate, if it so desires, the sale of all beverages which contain any degree of alcohol. It is the alcohol which makes the liquor dangerous, and it is the presence of alcohol which gives rise to the exercise of police power. If the alcohol is present in any quantity the *power* to regulate springs into life. Whether the liquor contains *enough* alcohol to warrant regulation is a question wholly within the sound discretion of the Legislature. It would be within the province of the court to inquire if the beverage necessarily contains alcohol or some other inherently injurious ingredient, if it does it is a subject of police regulation. But the court has no right to usurp the legislative prerogative, and after finding that the Legislature has the power, attempt to dictate to it when and where it shall exercise that power. Whether it has the power is for the court to say; whether it shall exercise that power is for the Legislature. This law attempts to regulate and tax the sale of nonintoxicating malt liquors. No liquor therefore can be affected by this law unless it is a *malt* liquor, and all nonintoxicating *malt* liquor is affected. This leads to the inquiry of what is malt liquor. Mr. Joyce, in his work on Int. Liq., sec. 12, defines it as follows:

"The common and approved usage of the term 'malt liquor' is an alcoholic liquor as beer, ale or porter, prepared by fermenting an infusion of malt."

The Century Dictionary defines it as a "general term for an alcohol beverage produced merely by the fermentation of malt." So then it is clear that all malt liquor is an alcoholic liquor, and the Legislature in this instance was dealing with a nonintoxicating alcoholic liquor. Intoxicating liquor is any liquor containing alcohol which can be drunk as a beverage in such quantity as will produce intoxication. Of such liquors as these the Legislature has provided a system of taxation and regulation by what is known as the Robertson-Fitzhugh law, but the Legislature evidently, for some good reason, deemed it wise to deal with another class of liquors which though denominated by name, and which were in fact nonintoxicating yet containing alcohol in various proportions.

It must be borne in mind that a liquor is not intoxicating unless it will make a person drunk who drinks it, and it is extremely difficult to draw the line on a "drunk." There are various stages such as "quarter dunk, half drunk, and dead drunk;" there are the stages

of being vivacious, foxy, tipsy, and on a "high lonesome," and it is about as difficult to determine when a young lady gets to be an old maid as it is to tell when a man has taken enough alcoholic stimulant to pass the line between a "jolly sober" and a "gentlemanly drunk."

Mr. Justice Dibrell, in the case of Railway Co. v. Robinson, 140 S. W., 434, has laboriously and learnedly attempted to define the vague term "drunk," but he practically gives up the question in despair. His discussion, in connection with this case, however, is interesting and instructive.

The Legislatures of different States have undertaken in some instances to prescribe what percent of alcohol in a liquor will constitute it intoxicating, and it is commonly understood that ordinarily a liquor which contains less than two percent of alcohol will not produce intoxication, though there is no fixed rules in regard to the matter. Whatever the percent is, say for convenience, two percent, then an alcoholic liquor which contains one and three-fourths percent would not be intoxicating, yet can it be said that an alcoholic liquor which lacks only one-fourth of one percent of alcohol to make it actually intoxicating is a beverage that can safely be sold promiscuously at cold drink stands and soda fountains, to unsuspecting persons who do not knowingly drink intoxicants or alcoholic beverages, and to boys and children of tender years who may thus be injured in health, or may thus innocently cultivate an appetite for stronger drinks. The Legislature could well assume that the taste and effect of such alcoholic stimulants, especially with children would be extremely injurious to the health and morals, and that it was necessary to deal with this class of drinks in some way. It is a matter of common knowledge, and of which this court will take notice, that the text-books which the children of Texas study in the public schools teach and impress the idea that alcoholic stimulants are injurious to the health and morals, and even the temperate use of such is discouraged. The Thirtieth Legislature, in prescribing a course of study in the public schools, among other things, required that the children should be instructed in physiology and hygiene, *including the effects of alcoholic stimulants and narcotics on the human system.* Three text-books have been selected by the text-book board which are now in use in all the public schools of Texas, which deal in no uncertain terms with the injurious and pernicious effects of alcoholic stimulants. We call attention to some of the lessons set out in the "First Book in Physiology and Hygiene," by Krohn, it being one of the official text-books adopted. On pages 66-68 under the title "Alcohol" we find the following:

"Alcohol is as clear and colorless as water; but as a drink it is just the opposite of water. If you have had your throat or chest rubbed with alcohol when you had a cold, you know how strong it smells. If you have seen it used in an alcohol lamp you know how quickly it flames up when it is lighted, and how soon it is all burned

out. That is just what alcohol does inside the body—it burns. It burns and destroys the parts of the body. It does not quench thirst. It makes the mouth and the throat drier, and the person who drinks it more thirsty still.

"Alcohol not a food.—Is alcohol a food? No, it does not nourish the body; it does not give it more strength; it does not make it warmer. It might seem for a few moments to warm it; but the feeling would not last long, and in a few moments the body would feel colder than before. It might for a few moments make us feel brighter and more lively. Why would it? It would be only like the whip used on a tired horse. It would excite us, but it would not help us. Afterward we should be duller and slower than before. What do we call a drink that excites but does not nourish us?

"Athletes drink no alcohol.—No young man who is being trained in athletics ever touches alcohol. His trainer would not allow him to do so; for there would be no use in helping a man to build a splendid body if the man were all the time taking something to tear it down. The athlete must have food to give him strength and quickness. He would stand no chance of winning in a contest if he should take drinks made of alcohol. If an athlete drinks alcohol—if he 'breaks training,' as it is called—his comrades look down upon him. Why do they? Because he was so weak as to give up the thing he set out to do just for the pleasure of a taste.

"Alcohol and habit.—Most alcoholic drinks are not pleasant when first tasted. Some burn the mouth and throat. A man has to learn to like them. And what a silly thing to do—to try to like a thing that is harmful. But the young man thinks it 'looks big' to drink with other men. He is afraid of being laughed at, and not thought manly if he refuses. If he only knew how much more manly it would be to refuse! Not only would he save his own health; he might help his companions by setting a good example. Most men begin by taking just a little once in a while. But very few men who once begin to drink find it easy to stop. That is the queer thing about alcohol; it starts a craving for more. Then the man will take stronger liquors and take them oftener, until he has so broken down his health that he is weak-minded as well as weak-bodied. Then he can not stop. The drunkard can not reason; he can not remember; he can not do what he makes up his mind to do; for he has whipped and abused his body, instead of feeding it, until it has broken down. Can such a man be a useful citizen?"

These strictures apply to *alcoholic drinks* and not alone to intoxicating liquors, and while the above language is made simple for children to understand, the truth of the deductions are too well known to deny, and if the indictment is true, it would seem clear that the Legislature has the right to deal with all alcoholic drinks under the police power of the State.

While the law under consideration only applies to nonintoxicating

malt liquors, and while the agreed statement of facts in the record
shows that Hiawatha, one of the beverages which relator was selling,
is a nonintoxicating malt liquor, it seems that it is not without a
judicial history in this State, and as we shall presently show, it may
not always be as harmless as this record would indicate. As we have
heretofore shown, all "malt liquor" contains alcohol, and as this
beverage therefore contains alcohol, we are not surprised at the effect
it seems to have had on some persons who imbibe it too freely. The
inoffensive sounding though illustrious name would not indicate a
dangerous character, but we are reminded that

> "Strong of arm was Hiawatha;
> He could shoot ten arrows upwards,
> Shoot them with such strength and swiftness
> That the tenth had left the bow string
> Ere the first to earth had fallen!"

And we are persuaded that this namesake has on occasion manifested
a good deal of "strength," and while its arrows might not be as
effective as the other Hiawatha's, we are not at all surprised to know
that when they have struck home the recipients were at least "half
shot," if not more seriously wounded. The first time that this al-
leged harmless and nondeleterious Hiawatha made its appearance in
the Texas courts was in the case of Deadweyler v. The State, re-
ported in 57 Texas Crim. Rep., 63, 121 S. W. Rep., 863. That was
a case where the appellant was convicted for selling a beverage labeled
Hiawatha, which was purchased from the Houston Brewing Com-
pany, and the opinion was written by Presiding Judge Davidson, of
this court, in October, 1909. The defendant was convicted for sell-
ing this beverage in violation of the local option law, and the defend-
ant says that the liquor was not intoxicating. The opinion states
that "the evidence is conflicting as to whether it was or was not in-
toxicating. The weight perhaps of the evidence is that it was not;
but there is evidence that it was intoxicating. There is also evidence
which seems to be uncontradicted that appellant bought the Hiawatha
under guarantee from the Houston Brewery, that it was a nonintox-
icant, containing alcoholic properties of less than two percent, and
that a sufficient amount of it could not be drunk so as to produce
intoxication. The State's evidence is that the liquid bought and
used was intoxicating and this is supplemented by evidence to the
effect that other parties had bought liquids of similar character from
appellant which produced intoxication, or could do so." It is interest-
ing to know that in this case an application was made in the trial
court for a continuance to procure the evidence of a chemist who
had been employed to analyze the liquor under investigation and
whom it was alleged would testify that such liquor, as shown by an-
alysis contained one and one-half percent and less than two percent
of alcohol in volume. Appellant also expected to prove by another
witness a chemist for the Houston Brewing Company, that the liquor

did not contain over two percent of alcohol in volume and hence not intoxicating. After disposing of the other alleged errors in the case the opinion states:

"It is contended that the evidence is not sufficient. The evidence for the State shows that the liquid sold was capable of producing intoxication. This was met by appellant with the evidence to the effect that he bought Hiawatha under guaranty that it was a nonintoxicant, and so believing he sold it. There is a good deal of testimony, pro and con, as to whether or not the drink would produce intoxication; that is, the beverage that was sold by appellant. Some witnesses testified that the liquid they bought from appellant was intoxicating, while there is considerable testimony from some other witnesses that they had used a great deal of it and what they used was not intoxicating. These matters were submitted by the court to the jury and found adversely to appellant. We are of opinion that under the circumstances this court would not be justified in reversing the judgment."

A more recent case in which this same beverage has played a prominent part is that of Sandaloski v. State, recently decided by this court and not yet reported. This is another conviction for selling intoxicating liquors in a local option county. The facts show that appellant sold a drink called "Hiawatha." He was the agent of the Houston Ice & Brewing Company, whom he said manufactured both beer and this drink called Hiawatha. It appears that appellant sold several casks of this liquid in a local option county, representing that it was nonintoxicating; that it was sold mostly in local option territory, the customers usually preferring beer in wet counties. The court says: "There is a sharp conflict in the testimony as to whether Hiawatha would produce intoxication. The witnesses for the State testify that it would, while the witnesses for the defendant are equally positive that it will not when drunk in quantities that can usually be drunk." The case was affirmed.

It would seem from the above cases that the Hiawatha referred to is the same kind of liquid as that sold by the relator, and that the court and jury were of the opinion that Hiawatha was not only not a harmless drink and one not deleterious to health, but in fact contained alcohol enough to warrant a jury in finding that the party who sold the same was guilty of violating the local option law. It would at least seem from these cases that if Hiawatha is not an intoxicating liquor, it is so nearly an intoxicant as to make it difficult to determine on which side of the line it should fall, and in either event it certainly contains alcohol enough that the Legislature was warranted in assuming that it, and all such malt liquors were dangerous beverages to be sold promiscuously and that the indiscriminate sale thereof should be discouraged.

But, it is argued that the Legislature has not attempted to regulate the sale of these liquors; that the measure is a tax or revenue

law pure and simple, and the case of Ex parte Woods, supra, in which this court held that the Act of the Thirtieth Legislature on this subject was unconstitutional is of controlling authority. While the opinion in that case does hold that the Act of the Legislature then under consideration was a tax measure and not regulatory, yet it was probably not necessary for the court to decide that point. Judge Ramsey, in that case, after reaching the conclusion that "the sole and only effect of the law, its sole and only purpose, is to levy a tax on the occupation named," says:

"Nor do we believe, with all possible respect to counsel, that this view is important in any event, for that, if there is in fact a discrimination and the legislation is violative of the bill of rights, and in the face of the Constitution, and that under whatever guise or under whatever pretext attempted, the result would not be different."

It will thus be seen that the court was of the opinion that the law as thus written was discriminatory, and in violation of the bill of rights, viewing it either as a police regulation or as a tax measure, and while not agreeing with the court in that opinion, yet under such construction it would not be applicable to this case. It was held in that case that the Act was unconstitutional because (1) it applied only to local option territory, and (2) because it exempted regular druggists or pharmacists who keep for sale, as a part of a regular drug stock, certain malt compounds used exclusively as a medicine and not sold as a beverage. The court expressly stated that no other questions were decided. While not conceding that a law applying alone to local option territory would render the law unconstitutional, when the object and purpose of the law as indicated by it was to prevent sales being made, yet the Act here under consideration is not subject to the criticisms there made. In fact, it is patent that the law was written to meet the objections urged by this court in that opinion, and which was rendered by a divided court. This law applies to all of the territory of the State and there are no exceptions in favor of druggists. We think, therefore, that the Woods case, supra, is not in point, but if the opinion then rendered is the law, it would authorize a law of this character as applicable to the entire State.

It is maintained that the law under consideration as passed and amended by the Thirty-First Legislature does not materially differ from the original Act passed by the Thirtieth Legislature in respect to its nature as to whether or not it is a revenue tax measure or a police regulation; that it is in fact a tax measure and the amount of tax being so large as to make it practically prohibitive it can not be upheld on this ground. It will be observed that this law now requires an applicant for a license to state the location at which he proposes to engage in the business and no person is entitled to engage in the business at more than one place under the same license, and no person can change his location without first filing with the county.

clerk a written statement showing such change of place of business. These conditions are not found in the original Act of 1907 and show a legislative intent to treat this tax and the license thereunder as a means of regulating or discouraging the sale of the liquors under consideration. At least considering the present law in all its phases, in connection with the other liquor laws of this State, and the history of liquor traffic regulation and considering the well established rules of construction governing such matters, we think it clear that this law as now framed is in the nature of a police regulation. If the primary purpose of the law was not in fact as a police regulation, it is at least a blending of a police regulation and an occupation tax measure, and whatever it may be called, we fail to see how it is in any sense unconstitutional. The Constitution of this State authorizes the Legislature to levy occupation taxes on all occupations whether harmless or not, and there is no limitation upon the Legislature as to the occupations taxed or the amount levied where the tax is levied as a police regulation in the proper exercise of the police power, except that all occupation taxes must be equal and uniform upon the same class of subjects within the limits of the authority levying the tax. (Con., sec. 2, art. 8.)

Mr. Cooley, in his work on Taxation, vol. 1, 3d edition, page 9, lays down this doctrine: "Everything to which the legislative power extends may be the subject of taxation, whether it be person or property, or possession, franchise or privilege, or occupation or right. Nothing but express constitutional limitation upon legislative authority can exclude anything to which the authority extends from the grasp of the taxing power, if the Legislature in its discretion shall at any time select it for revenue purposes; and not only is the power unlimited in its reach as to subjects, but in its very nature it acknowledges no limits and may be carried even to the extent of exhaustion and destruction, thus becoming in its exercise a power to destroy."

He further says in this connection that if the power be threatened with abuse, security must be found in the responsibility of the Legislature that imposes the tax; that the judiciary can afford no redress against oppressive taxation, so long as the Legislature imposing it shall keep within the limits of legislative authority and violates no express provision of the Constitution. The same author, in referring to occupation taxes, says: "They may be intended to discourage trades and occupations which may be useful and important when carried on by a few persons under stringent regulations, but exceedingly mischievous when thrown open to the general public and engaged in by many persons. An example is the heavy tax imposed in some States and in some localities or other States on those who engage in the manufacture or sale of intoxicating drinks. Two purposes are generally had in view in imposing such a tax: to limit the business to a few persons, in order to more efficient and perfect regulation, and also to produce a revenue. As no one will pay the tax who does

not expect to be reimbursed the expense from the profits of sales it is obvious that the heavier the tax the fewer can afford to pay it, and it may be made so heavy that no one can afford to pay it, and then it becomes prohibitory."

In Tiedeman's Limitations of Police Power, section 101, this eminent authority, in discussing the question of licensing and regulating certain occupations, says:

"Once having been judicially ascertained that the trade or occupation may be restrained, it is a matter of legislative discretion what kind of restraints can be imposed. The prosecution of the trade then becomes a privilege, for which as large a price can be demanded by the State as it may see fit."

This authority also quotes with approval from the case of Leavenworth v. Booth, 15 Kan., 627, as follows: "A proper license tax is not a tax at all within the meaning of the Constitution, or even within the ordinary signification of the word 'tax.' . . . The imposition of a license tax is in the nature of the sale of a benefit or privilege to the party who would not otherwise be entitled to the same. The imposition of an ordinary tax is in the nature of the requisition of a contribution from that which the party taxed already rightfully possesses."

The above principles were discussed in the case of Fahey v. The State, 27 Texas Crim. App., 146, in which the constitutionality of the liquor law of 1881 was questioned. The law was attacked on the ground that inasmuch as it levied an occupation tax on the sale of intoxicating liquors and also provided for the issuance of a license and a system of regulation, that is, an exercise of the police power and the taxing power, it embraced more than one subject and embraced subjects not expressed in the title of the bill. Second, that the Act was unconstitutional because it required a payment of the tax in advance for the term of one year, while the tax on other occupations was permitted to be paid quarterly. Judge Hurt, writing for the court in disposing of the first contention, says:

"We could concede, for the argument, that the object of these Acts is to regulate the sale of these liquors, to collect revenue and divers other purposes and objects; still, unless there was more than one subject in the Act it would be valid."

He says that clearly the subject of these Acts is the regulation of the sale of spirituous, vinous and malt liquors and the various provisions set forth in the law are related to and subsidiary to the main subject. In reference to the second contention the court held that the tax or regulation applied uniformly to all parts of the State, and in this it did not infringe upon the constitutional provision as to uniformity.

In this connection we desire to call attention to the very able brief printed in connection with the report of the above case. This brief was prepared by Hon. W. L. Davidson, then Assistant Attorney-Gen-

eral, and now presiding judge of this court, and it so clearly and forcibly presents the principles of law applicable to the case under consideration that we desire to quote from it as follows:

"It may be admitted as a general proposition that the taxing power is a separate power from that of police regulation, and equally so is the right of eminent domain. They have, as a general rule, a different operation, pursue a different channel, and attain different ends. However distinct their power and authority may be, and however wide they may diverge when considered as questions of inherent sovereignty, yet they have the same origin and spring from the same source. All the authorities agree that the right of eminent domain, the taxing power, the police regulation, all have their origin in and spring from necessity. All endorse the doctrine that the above enumerated powers are the strongest evidences of State sovereignty, and lie back of all law, organic or statutory. All the authorities agree that these powers are unlimited in the Legislature unless specially curtailed by the express provisions of the Constitution. It is a proposition not to be doubted that the Legislatures have the authority inherent to exercise proper legislation with reference to eminent domain, to levy taxes and provide for the collection of same, both on property and professions, pursuits and occupations, subject only to constitutional restrictions. It is equally certain that the 'necessity' is to be judged of by the Legislatures, and that their action is final unless in plain, clear and unequivocal terms that action is contrary to constitutional limitations. (Tiedeman, Lim. on Police Power, pp. 371-378; id., pp. 1-4; id., pp. 461-482; also 467-471; Potter's Dwarris on Stat. and Cons., pp. 444-467; Cooley Con. Lim., pp. 598, 673-676; Cooley on Taxation, pp. 1, 4, 384, 512.)"

In the same brief we find the following: "Is a State law levying an occupation tax, and requiring a license to be procured before pursuing that occupation, void and unconstitutional because said law invokes the taxing and police power at the same time and in the same law?

"The constitutionality of a law is presumed; and as a conflict between the Constitution and the statute is not to be · implied, it follows 'that the court, if ·possible, must give the statute such a construction as will enable it to have effect.' (Cooley's Con. Lim., side p. 183; Ex parte Mabry, 5 Texas Ct. App., 93; Newland v. Shafer, 29 Ill., 44.)

"As our Constitution does not limit the Legislature in levying occupation taxes, it would follow that the tax complained of is properly levied, and is not subject to criticism from this standpoint. (Texas Con., 1876, art. 8; Cooley's Con. Lim., 598; Cooley on Tax., 384.)

" 'Necessity' is the common source of the taxing power as well as of police regulation. It would follow that no arbitrary rule can be laid down that will or can make them antagonistic to each other;

and it would follow that, being grounded in necessity and in the inherent power of government, they can and are often called to aid and assist each other. Then, when relegated to fundamental laws of inherent authority complete sovereignty of the Legislature and the underlying law of necessity and self-preservation, and not being abridged by the Constitution of these powers, it would follow that, having their origin in these common sources, the taxing power and police authority can not be arbitrarily separated or be made to stand out opposed to each other by judicial construction or decision.

"The position assumed by appellant in his able brief is that these two great powers are antagonistic and can not be called to the aid of each other, that is, that the Legislature can levy the tax by virtue of its taxing power, but that it can not call into requisition the police authority to enforce the collection of that tax by virtue of the same Act of the Legislature. In other words, that an Act of the Legislature that sought to enforce the collection of the tax levied by that Act, by requiring the license to be procured before following that occupation, would be void as antagonistic to article 3, section 35, of the State Constitution, and in no emergency can the Legislature blend the taxing and police power, because it would be obnoxious to said article and section of the Constitution. This idea is fundamentally wrong. (Cooley on Tax., 66; Lane Co. v. Oregon, 7 Wall., 71; State v. Parker, 32 N. Y., 426; Eyre v. Jacob, 14 Gratt., 422; Davey v. Galveston County, 45 Texas, 291; Ex parte Cooper, 3 Texas Crim. App., 489; Tx parte Mabry, 5 Texas Crim. App., 93; Willson's Crim. Stats., sec. 195; Cooley on Tax., 385; License Tax Cases, 5 Wall., 472.)"

According to the authorities above cited, especially as to all subjects coming within the police power, the Legislature has full authority to adopt such means of regulation as it desires. It may be by a system of licenses and regulation, by a tax laid upon the occupation, or by a blending of a tax, license and regulatory provisions. We, fail to see ·how the primary purpose of this law could be construed to be for the purpose of raising a revenue. The tax imposed is so high that in the nature of things, considering the liquors affected, but few people, if any, could afford to pay the tax and procure a license. It would rather seem to have been the intention of the Legislature to place the tax so high that it would very materially discourage, if not prohibit, the sale of the character of liquors under consideration. Or if any persons would undertake to pay the tax and engage ·in the sale it would at least limit the number of establishments and enable the authorities to keep a closer surveillance over the business to see that the law was not violated in selling intoxicating liquors, having a close resemblance to the nonintoxicating liquors licensed under this law.

Relator in his brief has cited a great many authorities and quoted copiously therefrom to sustain the contention that it is not within

the police power of the State to place burdensome regulations or a burdensome tax upon nonintoxicating malt liquors. The cases cited, in the main, state propositions of law which we endorse, but the trouble is they have no application to the question here under consideration. Counsel for relator assume throughout their brief and argument that nonintoxicating malt liquors are harmless beverages and are in no sense in themselves injurious to the health, morals or public welfare of the people. Having assumed a wrong premise the arguments and authorities urged are foreign to the real issue in this case, as we see it. We have endeavored to show that nonintoxicating malt liquor is not a harmless beverage, but is in fact one which may well be productive of much harm and injury. On account of this incorrect premise assumed by counsel for relator, it would be an unnecessary consumption of time to go into a detailed discussion of the various authorities cited, but we will make a hurried review of a few of the cases presented which will show the general trend of all of them.

The first case cited by relator is Hirshfield v. City of Dallas, 15 S. W. Rep., 124, which involved the constitutionality of an ordinance of the city of Dallas imposing a license tax of five hundred dollars on railway ticket brokers. The ordinance levying this tax was declared to be unconstitutional, not because of the lack of authority to tax and regulate the railway ticket brokerage business, but because the business was not inherently harmful and injurious and a tax could not be placed upon it which was prohibitive, as the court was of the opinion this tax was. In the course of the opinion the court says: "Some occupations are so injurious that a tax prohibitory entirely would be justifiable. Others may or may not be injurious, owing to the manner in which they are carried on or pursued, and abuses which may flow from them. Of this latter class is, we take it, the business of the railway ticket broker or scalper."

The court says that there was testimony adduced to the effect that the tax was more than enough to regulate the business, and that the ticket broker business did not require near so much regulation as the saloon business, and it was further shown by the proof that the tax was prohibitive. Our contention is, and it is borne out by the facts, that nonintoxicating alcoholic liquors, the kind of liquors covered by the law under consideration, falls within the first class mentioned by the court in the above case and therefore the case is not authority against the constitutionality of this law. On the other hand it sustains it.

The next case cited is Owens v. The State, 53 Texas Crim. Rep., 105, 112 S. W. Rep., 1075, which involved the Act of the Twenty-Ninth Legislature imposing an occupation tax of five thousand dollars on persons engaged in the business of purchasing assignments of unearned wages. The court held the law unconstitutional because it was discriminatory, was in restraint of trade and the tax levied

was not on a business within itself of such a nature as to authorize a prohibitive tax to be levied against it. This case has no application to the taxing or regulation of the sale of alcoholic liquors which are universally recognized as a proper subject of police regulation, which may be prohibitive. ·

We have already reviewed the case of Ex parte Woods, 52 Texas Crim. Rep., 575, 108 S. W. Rep., 1171, cited by relator.

Relator quotes extensively from the leading case of Mugler v. Kansas, 123 U. S., 623, but we fail to find anything in that decision which tends to show the unconstitutionality of this law.

Ritchie v. The People, 40 N. E., 454, quoted by relator, was a case involving the constitutionality of the law declaring that no female should be employed in any factory or workshop more than eight hours in any day.

The case of State v. Smith, 84 Pac., 851, was a case involving the validity of an Act forbidding one to engage in the plumbing business except under certain restraints.

The case of In re Jacobs, 98 N. Y., 98, was a case involving the validity of an Act prohibiting the manufacture of cigars.

The case of People v. Marx, 99 N. Y., 377, was one involving the constitutionality of a law prohibiting the manufacturing out of any oleaginous substance, or any compound of the same, other than that produced from unadulterated milk, any article designed to take the place of butter or cheese, etc.

The case of People v. Steel, 83 N. E., 236, was one involving the validity of an ordinance in regard to the sale of theatre tickets, under certain conditions.

The case of State v. Ashbrook, 55 S. W., 627, involved the constitutionality of an Act making it unlawful for persons to conduct a department store without taking out a special license and paying the special tax.

The case of Wyeth v. Thomas, 83 N. E., 925, involved the constitutionality of a law regulating the undertaker business. Another case cited is one in regard to the plumbing business. Another case cited related to the business of lending money on household or kitchen furniture and wearing apparel. Another involved the law in regard to the regulation of sleeping car berths. Another involved the law regulating the construction of tenement houses.

The case, however, which relator stresses the most on is People v. Warden, 51 N. E., 1006, which involved the constitutionality of the ticket scalper law of New York. The decision of the majority of the court was written by Judge Alton B. Parker, and the law was held to be unconstitutional because the subject was not within the police power of the State. While the business of dealing in railroad tickets is not inherently injurious and therefore the same rules of law do not apply as apply to the sale of alcoholic beverages, yet it is proper to note that the Texas courts have not followed the opinion

in the New York case by Judge Parker, even in its application to ticket brokers.

In the case of Jannin v. The State, 51 S. W. Rep., 1126, which involved the validity of the Act of 1893, making it a penal offense for railroad tickets to be sold under certain conditions, this court expressly declined to follow the opinion of Judge Parker in the case referred to by relator. This court in the Jannin case says:

"As stated above, the opinion of the New York Court of Appeals on this subject runs counter to all of the authorities that have come under our observation. That court was divided on the subject, and in our opinion the very able discussion by Judge Parker is more than answered by the dissenting opinions of Justices Bartlett and Martin." (See also Ex parte Hughes, 50 Texas Crim. Rep., 614, 100 S. W., 160.)

The Supreme Court of this State in the cases of Lytle v. G., H. & S. A. Ry. Co., 100 Texas, 292, 99 S. W. Rep., 396, and Ex parte Testard, 101 Texas, 250, expressly held the opinion by Judge Parker not to be the law, and says that case stands alone, and is opposed to the great weight of authority.

We have found no authority which holds that alcoholic beverages, although not containing enough alcohol to produce intoxication, are harmless and not injurious, and none has been cited by counsel for relator. We find no authority placing the traffic in this class of beverages in the same category with the various, admittedly harmless, and many of them useful and necessary occupations of the kind which it was held by the various decisions referred to by relator were not of such a nature as to authorize a burdensome or prohibitive tax or regulation. On the other hand, the great weight of authority and reasoning is in favor of the proposition that this class of liquors, as far as the inherent power of the State to deal with them is concerned, is placed upon identically the same plane with all those alcoholic liquors which contain alcohol in such proportion as to produce intoxication. This being so, we think that these beverages are a proper subject of police regulation and that the Legislature may impose any tax which it desires or any regulation in reference to the sale of the same which bears any reasonable relation to the control of the traffic. We are of opinion that this law is not subject to the first criticism urged by relator against its constitutionality.

We shall now consider relator's second objection to this law, that is, that the Act has the effect to make the tax on the pursuit of the business named in it, unequal and not uniform, persons in those parts of the State where the Robertson-Fitzhugh law is in effect, having to pay one amount of tax for the sale of nonintoxicating malt liquors and those in the other parts of the State having to pay a different tax. It is urged that what is known as the Robertson-Fitzhugh law, passed by the Thirty-First Legislature, regulating the sale of intoxicating liquors, is a complete law covering the entire

subject, and includes within its provisions the taxing, licensing and regulation of all malt liquors whether intoxicating or not; that under the Robertson-Fitzhugh law a retail liquor dealer may pay $375 as a tax to sell spirituous, vinous and malt liquors, or pay $62.50 as a tax and obtain a license to sell malt liquors, and in either event such a licensee can sell nonintoxicating malt liquors without the payment of any additional tax, while if a person is not licensed under the Robertson-Fitzhugh law and undertakes to sell nonintoxicating malt liquors alone, he is subjected to pay a tax of $2,000; and relator argues with a good deal of plausibility that the Robertson-Fitzhugh law, chapter 17, Acts of the Thirty-First Legislature, repealed chapter 19 of the Acts of the same Legislature, which undertakes to impose the tax under consideration, and further that the law is highly discriminatory in favor of those persons licensed under the Robertson-Fitzhugh law and is an unreasonable and unnecessary classification, even if the Legislature had the power to impose the tax at all. In the first place, we are constrained to think that counsel for relator have misconstrued the purposes and effect of the Robertson-Fitzhugh law. The caption of the bill shows that it is an Act to regulate the sale of certain liquors capable of producing intoxication, and the caption does not refer to nonintoxicating liquors. Section 1 of this Act imposes a tax of $375 on wholesale dealers in spirituous, vinous or malt liquors, the same amount on retail dealers in such liquors and a tax of $62.50 on dealers in malt liquors exclusively; however, the statute expressly states that it licenses and has reference in each instance to such liquors only as are capable of producing intoxication. This is made clearer still by sections 2 and 3 of the Act. Section 2 defines a retail liquor dealer to be a person who sells spirituous, vinous and malt liquors and medicated bitters capable of producing intoxication. Section 3 is as follows: "A retail malt dealer is a person or firm permitted by law, being licensed under the provisions of this Act, to sell malt liquors *capable of producing intoxication,* exclusively in quantities of one gallon or less, which may be drunk on the premises."

It will thus be seen from the caption of the Act and from its express provisions that the law in fact licenses and applies to those liquors which are capable of producing intoxication, whether they are spirituous, vinous or *malt* liquors. The only provisions of the law which gives color to the contention made by relator that the Robertson-Fitzhugh law covers nonintoxicating malt liquors is section 34 of the law which defines intoxicating liquor to mean, among other things, "fermented" liquor. As it is conceded that malt liquor is produced by fermentation, it is urged with some force that under section 34 this law was intended to cover all malt liquors whether intoxicating or not. However, we do not think the contention of relator can be sustained. It is proper in construing an Act

Vol. LXIV Crim.—24.

of the Legislature to give every part of the law force and effect and not place such a construction upon it as would make one provision of the law directly conflict with another, and if relator's contention is correct, section 34 of the law is in direct conflict with sections 1, 2 and 3. It is clear from sections 1, 2 and 3 that the Legislature was only dealing with and licensing the sale of intoxicating liquors.

If relator's contention is correct and the Robertson-Fitzhugh law covers the sale of nonintoxicating malt liquors, as well as intoxicating malt liquors, no person could obtain license to sell nonintoxicating malt liquors at all in any county where local option has been adopted, because no licenses under that law can be issued for such territory, and all persons selling these liquors in nonlocal option territory without having obtained a license as provided for in the Robertson-Fitzhugh law would be subject to prosecution. In other words, relator's contention makes him guilty of pursuing a taxable occupation without having obtained the required license, as he admits that he has none of any kind.

However, if the relator in this case had been prosecuted under the Robertson-Fitzhugh law for pursuing without license the occupation of selling this admittedly malt liquor, but one which it is admitted in this case was not intoxicating, could a conviction be sustained? Would he not point to section 3 of the Robertson-Fitzhugh law to show that the license required for the sale of malt liquors applies only to such malt liquors as are capable of producing intoxication. We therefore think that the contention of relator can not be sustained that the business taxed by the law under investigation is covered by the Robertson-Fitzhugh law, when it is agreed the statement of facts that it is not an intoxicating liquor, or that the person who holds a license under the Robertson-Fitzhugh law for which he pays $62.50 is given a distinct advantage over the person who sells nonintoxicating malt liquors and is forced to pay a $2,000 tax.

It is generally conceded that the Legislature has a right to make any reasonable classification as to the tax imposed and the license conditions required, as to the kinds of liquor sold, the places where sold, and the persons engaged in the sale thereof. The tax may be levied upon the sales, although by that method one dealer pays more tax than another. This was so held in this State under the old register or bell-punch law. (Albrecht v. State, 8 Texas Crim. App., 216.)

A law taxing all of a class alike is valid though it taxes those of another class at a different rate. (Territory v. Connell, 2 Ariz., 339.)

A tax of one amount to sell generally and another amount to sell malt liquors has been held to be valid. (Timm v. Harrison, 109 Ill., 593.)

A tax of one amount on those dealing in distilled liquors on land, and another amount on persons following like occupations on steamboats, has been upheld. (Kaliski v. Grady, 25 La. Ann., 576.)

One tax may be levied upon breweries and distillers and another on saloons. (Adler v. Whitbeck, 44 Ohio, 539.)

A statute imposing a tax on wholesalers but exempting manufacturers was held to be valid. (Senior v. Rattaman, 44 Ohio, 661.)

The fact that a statute enables one county to levy a tax in a certain amount and another county on another amount does not render the statute invalid, as was held in this State in the case of Fahey v. The State, 27 Texas Crim. App., 146.

We could cite a great many other instances where various classifications along this line have been upheld. In the Robertson-Fitzhugh law itself we find no less than five distinct classifications as to the sale of various kinds of liquors. First, wholesale dealers are placed in a class by themselves and pay a tax of $375, but have no license burdens. Second, dealers in spirituous and vinous liquors are in a distinct class and pay $375 tax and are subjected to strict regulation provisions. Third, retail malt dealers are in a distinct class pay $62.50 tax and are subjected to strict regulation. Fourth, druggists who sell on prescription are in a distinct class and must pay a tax of $375, but are not required to comply with the regulation conditions imposed upon retail liquor dealers. Fifth, wine growers who sell wine of their own production are not required to pay any tax at all, and are only governed by slight regulation provisions. This law also has distinct classifications as to the persons engaged in the business. Any person, or corporation, may obtain a license to sell at wholesale, but no person, except a male resident of Texas, more than twenty-one years of age, can obtain a license to sell at retail, and there are other provisions which are a further limitation upon the issuance of retail liquor dealers' licenses. It would be useless to go into detail as to all of the various liquor laws of this State and the classifications which are made, some applying to the whole State, some to local option territory only, and some to wet territory only. These and similar classifications have almost universally been sustained. See Joyce on Intoxicating Liquors, sections 176, 177 and 178; also Woollen & Thornton on Intoxicating Liquors, sections 133, 134 and 135.

While the tax imposed in this instance on the occupation of selling nonintoxicating malt liquor is a great deal larger than that imposed on retail malt dealers, licensed under the Robertson-Fitzhugh law, yet it must be borne in mind that there is a vast difference in the other burdens thrown around the two classes of dealers. As to dealers in nonintoxicating malt liquors, there are practically no provisions of law placing any burden, except the sole one of paying the tax and securing the license, but in the case of a retail malt dealer in intoxicating liquors the licensee is required to give a large bond containing very strict provisions and conditions. He is prohibited from selling to various classes or persons and from selling at certain specified times. His license and the money paid are subject to be forfeited

at any time if he violates the provisions of the law, which are ex-
tremely strict, and when his license has been forfeited he is out-
lawed as a liquor dealer, not only for himself, but as a bartender
for any other person for five years. There is another feature, which
relator seriously insists that can not be taken into consideration in
making this classification, which, we think, considering the ques-
tion in its broadest view, may be of considerable importance. It is
that in parts of the State where local option has been adopted the
unlimited and unhampered sale of nonintoxicating malt liquors, some
of them resembling intoxicating liquors very much in appearance,
and some of them containing alcohol in such proportion as to verge
on the line of intoxicants, offers such a promising field to the un-
lawful sale of intoxicants, and entails such an expense and annoy-
ance on the part of the officials to detect and punish such violators,
in local option territory. We think this could be taken into consid-
eration by the Legislature in passing this law, which would have the
effect to at least very materially discourage the sale of all such bev-
erages. It is no doubt true as urged by relator, and as stated by
the authorities quoted by him, that the Legislature would not have
the authority to impose a prohibitive tax or unreasonable burdensome
regulations upon a business which is harmless in itself and not in-
herently dangerous simply because some dishonest persons would pur-
sue the business in such a way as to furnish a cloak for violations
of the law. But as we have shown heretofore, nonintoxicating malt
liquors are not harmless within themselves, but on account of the
alcoholic element in them they are inherently injurious and harmful,
and the Legislature, this being so, would undoubtedly have the au-
thority to pass stringent laws leveled at the regulation of the sale
of these liquors alone, or as an aid to the regulation and prohibition
of the sale of kindred liquors when it becomes necessary, to prevent
fraud and the violation of the law to do so. For these reasons we
think that the Legislature had the authority to make this classifica-
tion, not only for the purpose of discouraging or regulating the sale
of these nonintoxicating liquors, on account of the inherent nature
of the liquors themselves, but also on account of the fact that such
a tax and classification would tend to materially assist in the en-
forcement of the law in those counties of the State where the local
option law has been adopted.

As we have already shown, the Robertson-Fitzhugh law does not
cover the same class of liquors as that covered by the Act under
consideration under the facts in this case, and does not constitute
class legislation as between persons licensed under the Robertson-
Fitzhugh law and under this one. Neither do we think that the
Robertson-Fitzhugh law is in conflict with this enactment or that it
repealed it.

It will be noticed that the law placing a tax on nonintoxicating

malt liquors was passed at the regular session of the Thirty-First Legislature. The Act known as the Robertson-Fitzhugh law was passed at the first called session of the Thirty-First Legislature. The law passed at the regular session of this Legislature placing a tax on nonintoxicating malt liquors was amended at the second called session of the same Legislature, as shown by chapter 9, page 397, of the session laws. So that we find the same Legislature first passing the law under consideration, then passing the Robertson-Fitzhugh law, and afterwards amending the former law. This certainly shows that the Legislature did not intend in passing the Robertson-Fitzhugh law to repeal the nonintoxicating malt liquor tax law which it had passed at the regular session of the Legislature.

The rule that statutes in pari materia should be construed together applies with peculiar force to statutes passed at the same session of the Legislature. It is to be presumed that such Acts are imbued with the same spirit and actuated by the same policy; and practically all authorities agree that they should be construed together as if parts of the same enactment. The rule is that such statutes should be held to be harmonious and force and effect given to each. In the case of Southern Pac. Ry. Co. v. Sorey (not yet reported), our Supreme Court discusses this question fully and ably, and holds it the duty of the courts to so construe the Acts as to permit both to stand when it can be done without doing violence to the legislative intention.

It is also well established that where one statute deals with a subject in comprehensive terms and another statute deals with a portion of the same subject in a more definite way, the two should be read together, if possible with a view to giving effect to a consistent legislative policy. However, if there is any necessary conflict between two such laws the special will prevail over the general statute.

"Where the special statute is later, it will be regarded as an exception to, or qualification of, the prior general one, and when the general Act is later, the special will be construed as remaining an exception to its terms, unless it is, repealed in express words or by implication." Cyc., 36, 1161. Rogers v. United States, 185 U. S., 83; Rosencrans v. U. S., 165 U. S., 257; Lazonby v. Smithey, 131 S. W., 708.

In view of the principles above announced, it seems clear that even if relator's contention is correct that the Robertson-Fitzhugh law standing alone would cover the sale of nonintoxicating malt liquors, yet in view of the fact that it is a comprehensive general law dealing with the subject in various phases, it would not prevail over a special law passed by the same Legislature dealing particularly with one branch only of the subject. There is no express repeal of this law in the Robertson-Fitzhugh law, and as is well known repeals by implication are not favored.

Conceding, for the sake of argument, that the tax imposed in this instance is prohibitive, and viewing it from the standpoint of a tax measure or as a police regulation, we fail to see wherein it would be unconstitutional.

A Legislature of a State undoubtedly has the right to absolutely prohibit the sale of or place a prohibitive tax upon the sale of any articles which in themselves are harmful or which may be injurious to the health, morals or general welfare of the people, unless there is some constitutional inhibition against the same. There is no constitutional inhibition, so far as we are aware, in this State that would prohibit the Legislature from passing a law which would have the effect of prohibiting the sale of nonintoxicating malt liquors within the confines of this State.

It is urged by some that section 20, article 16, of the State Constitution, is a limitation upon the authority of the Legislature to prohibit the sale of intoxicating liquors, but whether or not that constitutional provision is a limitation upon the Legislature in this regard, it can have no application to nonintoxicating alcoholic liquors. The constitutional provision refers in express terms to intoxicating liquors. It is well to remember what this court so well said on this subject in the case of Albrecht v. State, 8 Texas Crim. App., 216, that "courts are not authorized to hold a statute unconstitutional merely because, in their opinion, it may be violative of public policy or contrary to what they may esteem the general spirit of the Constitution or the genius of our political institutions. When they conclude that an Act of the Legislature is void by reason of its unconstitutionality, they must be able to point with certainty to the exact provision of organic law violated by the enactment."

In conclusion, we do not think this law is violative of any constitutional safeguard of this State, and viewing the matter either as a tax measure or as a police regulation, or both, we do not think that it is unconstitutional. As before suggested, this is the second time the Legislature has passed a law in regard to the sale of nonintoxicating malt liquors. After the first law was declared unconstitutional by this court the Legislature must have felt that there was an urgent need of such legislation to have passed a law on the same subject again, knowing that it would have to run the gauntlet of searching judicial scrutiny.

The law as now framed applies to all of the territory of the State and applies alike to all persons dealing in this class of liquors under the conditions prescribed by law. There being no constitutional inhibition against the passage of such a law, and the Legislature being the sole judges of whether or not the necessity exists for passing it, we are clearly of opinion that the law should be upheld and that the relator should be remanded.

Accordingly it is held that the law in question is not violative of

any provision of the State Constitution, and is but an exercise of the police power inherent in sovereignty, and relator is remanded.

PRENDERGAST, Judge.—I fully concur.

[Rehearing denied February 28, 1912.]

DAVIDSON, Presiding Judge (dissenting).—Appellant is held in custody charged with selling nonintoxicating liquors without procuring license as required by the statute. Judge Harper granted the writ of habeas corpus, making it returnable before this court. The case has been submitted on brief and oral argument by both sides. Counsel for applicant have filed brief and argument which fully, satisfactorily and conclusively sustain the contention that the Act under which he is arrested is unconstitutional and void. To go into the questions involved would be but to review and practically rewrite what has already been written by applicant's attorneys. In view of the fact that they have so ably and exhaustively discussed these questions, I content myself with adopting said brief and argument as my dissenting opinion.

The brief was prepared by and is the work of the following named attorneys: Mr. J. B. Bisland, Messrs. Baker, Botts, Parker & Garwood; Messrs. McGregor & Gaines, and Mr. Jesse Andrews, and is as follows, to wit: "On and prior to October —, 1911, the relator, W. H. Townsend, was, and had been engaged in the grocery business, carrying a full line of staple and fancy groceries and supplying a general grocery trade, and as a part of the grocery stock and in connection therewith he sold and kept for sale and engaged in the business of selling soda water, "Hiawatha," which is a nonintoxicating malt liquor, and other soft drinks, in the town of Orange, in the county of Orange, in the State of Texas, and as such groceryman he paid all necessary merchant's taxes, licenses, etc., other than the licenses and taxes which it is set out in the statement of facts in this case that he had not paid.

"That on the —— day of October, 1911, a complaint and information was issued against relator charging that he had not procured a license to engage in the business such as is spoken of in the Act of the Thirty-First Legislature, entitled "An Act to levy an occupation tax on all dealers in nonintoxicating malt liquors," etc., and had not paid the two thousand ($2,000) dollar tax to the State, nor the one thousand ($1,000) dollar tax to the county, which the Commissioners Court of that county had sought to levy under the assumed authority of that Act. The complaint and information were regular in form.

"The relator presented his petition for habeas corpus to the county judge of Orange County, which was denied for the reason indorsed on said petition, whereupon relator presented his petition to this court and is now before this court and says that his arrest and restraint are illegal; that he should be discharged from custody because

there is no valid or constitutional law of this State that warrants the information or excuses the confinement. The question therefore presented by the application is the constitutionality of the above Act of the Thirty-First Legislature.

"The relator asserts that the Act is unconstitutional on two separate and distinct grounds. First, that the amount of the tax sought to be imposed by it is prohibitory and that therefore on account of the Act the citizens of the State are prevented altogether from engaging in the pursuit of a lawful business; and second, that the Act has the effect to make the tax on the pursuit of the business named in it unequal and not uniform, persons in those parts of the State where the Robertson-Fitzhugh law is in effect having to pay one amount of tax for the sale of nonintoxicating malt liquors and persons in the other parts of the State having to pay a different tax; and we shall proceed with the discussion of the constitutionality of the Act in this order.

"Proposition. The Act is unconstitutional because if given effect it would prevent the citizens of the State altogether from engaging in the pursuit of a lawful and harmless occupation.

"Statement. That such was indeed the purpose of the Legislature is shown by the subsequent amendment of the Act at the special session, by which the law which had just been passed was so changed, that separate license and another tax was required for each place in the county where the occupation was pursued.

"Authorities. Tiedeman's Limitations of Police Power, section 102; Freund, Police Power, sections 492, 493, 494, 498, secs. 62 and 223; Hirshfield v. City of Dallas, 15 S. W., 124; Owens v. State, 53 Texas Crim. Rep., 105, 112 S. W., 1075; Ex parte Woods, 52 Texas Crim. Rep., 575, 108 S. W., 1171; San Antonio & A. P. Ry. Co. v. Wilson, 1 Texas Civ. App., 675, 19 S. W., 910; Mugler v. Kansas, 123 U. S., 661; Lochner v. New York, 198 U. S., 45; In re Jacobs, 98 New York, 98; Allgeyer v. Louisiana, 165 U. S., 578; People v. Marx, 99 New York, 377; People v. Warden, 51 N. E. Rep., 1006; Railway Co. v. City of Jacksonville, 67 Ill., 37; Ritchie v. The People, 40 N. E. Rep., 454; People v. Steele, 83 N. E., 236; Wyeth v. Thomas, 83 N. E. Rep., 925; State v. Redmon, 114 N. W. Rep., 137; Bonnett v. Vallier, 116 N. W. Rep., 885; State v. Smith, 84 Pac., 851; Morton v. Macon, 50 L. R. A., 485; State v. Williams, 61 S. E., 61; State v. Ashbrook, 55 S. W. Rep., 627.

"The question presented by this application, viz.: The right of a citizen to be protected by the guarantee of a written Constitution in the unmolested pursuit of an occupation that is not harmful to his fellow man, is one of transcendental importance, and if, as we think, the authorities clearly show the Legislature has by the Act referred to, overstepped the limits of the powers intrusted to it by the people, and has by this Act set a precedent which if allowed to go unchallenged would be subversive of the foundations of civil liberty, then, though it be the one hundredth Act of the Legislature on the same

subject rather than the second this court could render no higher service to the people to whom it owes its being; than to again exercise the powers vested in it as one of the three coordinate departments of government, to prevent such a principle from finding a lodgement in the jurisprudence of this State. The question is not whether the relator shall be permitted to sell nonintoxicating malt liquors, but it is whether the majority that happens to be dominant at the time, can suppress and destroy the business of a citizen. We think that it has rarely happened that a question of more importance to the liberties of the people has been before this court for decision. Written Constitutions would be meaningless or their efficacy would be to a large extent impaired if the construction of them was left entirely to the law making body. Howevermuch civil liberty may owe its existence to the Constitutions of the several States and of the United States, these safeguards of the peoples' rights would amount to but little if there were not the courts to stand guard over the rights secured by them and strike down all legislation that contravenes them. It is to the courts alone that the citizen can turn where, as in this case, the Legislature has undertaken to exercise a power not entrusted by the people to it. In declaring a law unconstitutional on the ground that it deprives a certain class of citizens of the right to freely prosecute their chosen occupation, the Supreme Court of Illinois in the case of Richie v. People, 40 N. E., 454, a case that we will have occasion to refer to later on, said, in quoting from In re Jacobs, 98 N. Y., 98: "In reaching this conclusion (that the law was unconstitutional and void) we have not been unmindful of the power which courts possess to condemn legislative Acts which are in conflict with the supreme law, should be exercised with great caution and even with reluctance. But, as said by Chancellor Kent (Comm., 450): 'It is only by the free exercise of this power that courts of justice are enabled to repel assaults and to protect every part of the government and every member of the community from undue and destructive innovations upon their charter rights.'"

Mr. Justice Harlan in Mugler v. Kansas, 123 U. S., 661, expresses the thought in this language: "There are of necessity limits beyond which legislation can not rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, Sinking Fund Cases, 99 U. S., 700, 718, the courts must obey the Constitution rather than the law making department of government, and must upon their own responsibility determine whether in any particular case these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch, 137, 176, 'are powers limited and to what purpose is that limitation committed to writing, if these limits may at any time be passed by those intended to be restricted? The distinction between a government with limited and unlimited powers, is abolished, if these limits do not confine the

persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation."

" 'There may be autocracy of the sovereign,' says the Supreme Court of Wisconsin, in the case of State v. Redmon, supra, 'whether the term is used in a personal sense or as representing the people in the aggregate acting through their representatives. One might be quite as dangerous as the other without the restraints of a written Constitution and an independent and courageous judiciary to stand guard at the boundaries thereof.

"With our system, the danger of destruction or impairment of the inherent system, by well meant but improvident legislation is too remote to be disturbing as to the future, for as is said in effect in Marbury v. Madison, 'No enactment is controlling if the tribunal created by the Constitution to pass upon its character can not reasonably escape the conclusion that the paramount law condemns it.'

"All of the cases quoted from presented conditions of fact analogous to 'the case at bar. In the case of State v. Williams, supra, a case growing out of an indictment for the mere bringing into the county of more than one-half gallon of spirituous, vinous or malt liquor, the Supreme Court of North Carolina, in an opinion declaring the Act unconstitutional, said: It is the right of the citizen when called to the bar of the court, to appeal to the Constitution and demand that the court declare whether the statute which he is charged with violating, be 'the law of the land.' To make this right of any value or protection to the citizen it must be the duty of the court to declare its judgment thereon. To deny this is to keep the promise to the ear and break it to the hope—to make of none effect the declaration that 'ours is a government of law, and not of men.' 'It will be an evil day for American liberty, if the theory of a government outside of the supreme law of the land finds lodgment in our constitutional jurisprudence. No higher duty rests upon this court than to exert its full authority to prevent all violations of the principles of the Constitution.' Harlan, J., in Downes v. Bidwell, 182 U. S., 382, 21 Sup. Ct., 823, 45 L. Ed., 1008. . . . The people in the exercise of their political sovereignty established the government, delegated to it certain enumerated powers, assigned to it appropriate functions, established departments, and assigned to them appropriate duties and powers, imposed such limitations as experience had taught to be necessary for the preservation of liberty and, to the end that their government should not by construction, implication or otherwise deprive them of unenumerated, but, 'inalienable rights,' declared: 'This enumeration of rights shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people.' Article 1, paragraph 37. This court in Bayard v. Singleton, 1 N. C., 5 (1787), after most careful consideration 'and with great deliberation and firmness' unanimously declared that no Act which the Legislature could pass could, by any means, repeal or

alter the Constitution. However much we may desire to sustain the Acts of the Legislature as a coordinate department of the government, we may not, without being recreant to the duty imposed upon us and the rights of the citizen refuse to decide firmly and fearlessly the issue which he makes with the government."

"The provision of the fundamental law of which this Act is violative, is that in the State Constitution which provides that no citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due process of the law of the land (section 19, art. 1), and that of the Federal Constitution which provides that no State can deprive any person of life, liberty or property without due process of law. (Fourteenth Amendment.)

"That the right to pursue a lawful occupation is one of the liberties of a citizen which are protected by this constitutional safeguard has so often been declared in the decisions of the courts of the country, that citation of authorities for this position would hardly seem necessary. The scope of these rights can not be better expressed in language than in the quotations from the authorities contained in the able and exhaustive opinion of Judge Alton B. Parker, in the case of People v. Warden of City Prison, supra, to which we shall have occasion to refer later on in this argument. This case involved the question of the constitutionality of an Act prohibiting persons in the State of New York from engaging in the business of brokerage in passenger tickets. The Act was held unconstitutional. The language referred to is as follows: 'The word "liberty" as employed in the provision of the Constitution quoted, was considered by this court in Re Jacobs, 98 N. Y., 98, in a masterful opinion by Judge Earl. He said (pages 106, 107): "So, too, one may be deprived of his liberty and his constitutional rights thereto violated without the actual imprisonment or restraint of his person. 'Liberty' in its broad sense as understood in this country, means the right, not only of freedom from actual servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel these rights, which limit one in his choice of a trade or profession, or confine him to work or live in a specified locality, or exclude him from his own house, or restrain his otherwise lawful movements (except as such laws as may be passed in the exercise by the Legislature of the police power, which will be noticed later), are infringements upon his fundamental rights of liberty, which are under constitutional protection."'

"In People v. Marx, 99 N. Y., 377, 2 N. E., 29, this court declared unconstitutional a statute that prohibited the manufacture and sale of any substitute for butter or cheese produced from pure, unadulterated milk or cream. Judge Rapallo, speaking for the court, said:

'Among these no proposition is now more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuits, not injurious to the community, as he may see fit. The term "liberty" as protected by the Constitution, is not cramped into a mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary to the common welfare.'

"In People v. Gillson, 109 N. Y., 389, 17 N. E., 343, a statute was declared to be unconstitutional which prohibited the sale of any article of food, or offering or attempting to do so, upon any representation or inducement that anything else would be delivered with a prize, premium or reward to the purchaser. Judge Peckham, in delivering the opinion of the court, after considering the statute, said (page 399, 109 N. Y., and page 346, 17 N. E.); 'A liberty to adopt or follow for a livelihood a lawful industrial pursuit, and in a manner not injurious to the community, is certainly infringed upon, limited, perhaps weakened or destroyed, by such legislation.' "

In Ritchie v. People, in which a law declaring that no female should be employed in any factory or workshop more than eight hours in any day, was held unconstitutional, the Supreme Court of Illinois, referring to the Act, said:

"Is the restriction thus imposed an infringement upon the constitutional rights of the manufacturer and the employe? Section 2 of article 2 of the Constitution of Illinois provides 'that no person shall be deprived of life, liberty or property without due process of law.' A number of cases have arisen within recent years in which the courts have had occasion to consider this provision, or one similar to it, and its meaning has been quite clearly defined. The privilege of contracting is both a liberty and property right. Froer v. People, 141 Ill., 171, 31 N. E. Rep., 395. Liberty includes the right to acquire property and that means and includes the right to make and enforce contracts. State v. Loomise, 115 Mo., 307, 22 S. W. Rep., 350. The right to use, buy and sell property and contract in respect thereto, is protected by the Constitution."

"The recognition of the fact that the right to allow a lawful pursuit is included within the constitutional safeguard is expressed by the Supreme Court of Massachusetts in the case of Wyeth v. Thomas, supra, a very recent case (decided this year), as follows: 'The right to enjoy life, liberty and the pursuit of happiness is secured to everyone under the Constitution of Massachusetts. This includes the right to pursue any proper vocation to obtain a livelihood. Substantially the same right is secured also by the Constitution of the United States, which does not permit a State to deprive any person of life, liberty, or property without due process of law. The nature of this

right has been stated and illustrated in many cases. Com. v. Strauss, 191 Mass., 545, 78 N. E. Rep., 136, 11 L. R. A. (N. S.), 968; Com. v. Perry, 155 Mass., 117, 28 N. E., 1126, 14 L. R. A., 325, 31 Am. St. Rep., 533; Winthrop v. New England Chocolate Co., 180 Mass., 464, 62 N. E., 969; Austin v. Murray, 16 Pick., 121; Lochner v. New York, 198 U. S., 45, 25 Sup. Ct., 539, 49 L. Ed., 937; Allgeyer v. Louisiana, 165 U. S., 578, 17 Sup. Ct., 427, 41 L. Ed., 832; Yick Wo. v. Hopkins, 118 U. S., 356, 6 Sup. Ct., 1064, 30 L. Ed., 220; Minnesota v. Barber, 136 U. S., 313, 10 Sup. Ct., 862, 34 L. Ed., 455.'

"One may be deprived of his liberty," says the Supreme Court of Washington in the suit of State v. Smith, supra, in which an Act forbidding one to engage in the plumbing business, except under certain restraints was held unconstitutional, quoting from the case of In re Aubrey, 78 Pa., 900: "And his constitutional rights thereto may be violated without actual imprisonment or restraint of his person. 'Liberty' in its broad sense, as understood in this country, means the right not only of freedom from actual servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways to live and work when he will, to earn his livelihood, in any lawful calling or to pursue any lawful trade or avocation. All laws therefore which impair or trammel these rights, which limit him in his choice of a trade or profession, are infringements upon his fundamental rights of liberty which are under constitutional protection.' "

But we need not go beyond the decisions of our own court to find authorities for this question. It is expressly so decided in the case of Owens v. State, 53 Texas Crim. Rep., 105, 112 S. W., 1075. In that case the language of Judge Snyder, in the case of State v. Goodwill, 33 W. Va., 183, was quoted with approval by Judge Brooks, to wit: "A person living under the protection of this government has the right to adopt and follow any lawful industry, or pursuit, not injurious to the community, which he may see fit."

The "right" here referred to does not mean the right, in the absense of legislative forbiddance, but means the right, notwithstanding the Legislature. It is a privilege and an immunity that rises beyond the power of the Legislature to decide or prevent, it has its foundation in the very corner stone of the government.

The only limitation on the right of the citizen to follow this pursuit, notwithstanding the enactment of the Legislature to the contrary, is that the proper regulation or prohibition of it does not fall within the police power of the Legislature. The question then presented is, Can the prohibition of the sale of nonintoxicating malt liquors reasonably be said to be within the police power of the Legislature? This question we shall undertake to answer presently, but before doing so we desire to call attention to what is clearly *not* within the police power as by so doing we can arrive at a clearer conception of the pursuit or occupation at which the Act could be

legitimately said to be directed. The purpose that we have immediately in mind grows out of the fact that it is sometimes said that the business, or ostensible business, of selling nonintoxicating malt liquor is made and used for a cloak for selling liquors in violation of local option laws. It is said that the sale of nonintoxicating malt liquors in local option territory should be prohibited so as to more effecutally prohibit the sale of intoxicating liquors, and thereby enforce local option laws in local option territory. That the regulation and suppression, if need be, of the sale of intoxicating liquors is within the police power of the State, is of course well settled, and it might be urged that if the permission to sell nonintoxicating liquors militated against the suppression of the liquor traffic, that such permission should be withheld, and the right to withhold it would fall within the police power of the Legislature. Happily, we are not limited to our own deductions from the decisions in general for authority for the proposition that a pursuit otherwise lawful, will not be held to be within the police power merely because it can be or has been unlawfully pursued, but we have decisions of the courts expressly upon the point. It is well recognized, as a principle of the law of police power of Tiedeman in his admirable treatise on the Limitation of the Police Power. We take the liberty to quote this author's discussion on this principle at length: "It is not sufficient that the public sustains harm from a certain trade or employment, as it is conducted by *some* who are engaged in it. Nor is it sufficient that all remedies for the prevention of the evil prove defective, which fall short of total prohibition. Because many men engaged in the calling persist in so conducting the business that the public suffer, and their actions can not otherwise be effectually controlled, is no justification of a law which prohibits an honest man from conducting the business in such a manner as not to inflict injury upon the public. In order to prohibit the prosecution of a trade altogether, the injury to the public, which furnishes the justification for such a law, must proceed from the inherent character of the business. Where it is possible to conduct the business without harm to the public, all sorts of police regulations may be instituted, which may tend to suppress the evil. Licenses may be required, the most rigid system of police inspection may be established, and heavy penalties may be imposed for the infractions of the law; but if the business is not inherently harmful, the prosecution of it can not rightfully be prohibited to one who will conduct the business in a proper and circumspect manner. Such an one would 'be deprived of his liberty' without due process of law." . . .

Again, on page 293, it is said: "As has already been stated, the police regulation of an employment may extend to any length that may be necessary for the prevention and suppression of fraud in its pursuit, but an honest man can not be denied the privilege of conducting the business in an honest and lawful manner because dis-

honest men are in the habit of practicing gross and unsuccessful frauds upon those with whom they have dealings. If it were a justifiable ground for abolishing any business, many important, perhaps some of the most beneficial, employments and professions could be properly prohibited."

"It will be observed that the court says that it is not sufficient that the trade or employment *as it is conducted by some* causes public harm, and that because many men engaged in a calling persist in so conducting it that the public suffer is no justification of a law 'which prohibits an honest man from conducting the business in such a manner as not to inflict injury upon the public.' Further, that the injury to the public which furnishes the justification for such a law 'must proceed from the inherent character of the business.' Where it is possible to conduct the business without harm to the public, this should be accomplished by police regulations. It is not sufficient, therefore, to justify a law of this kind, that there may be those who, under the guise of selling this harmless drink, make of it a means of selling intoxicating liquor and doing that which the law forbids. In the language of the author, 'such a propensity on the part of those unlawfully disposed, offers no justification for prohibiting the man from conducting the business who intends to do so honestly.' That the sale of nonintoxicating beverages is harmless, is apparent. Indeed, it is admitted. The language of the author, therefore, is striking when he says:

"The justification for such a law must proceed from the inherent character of the business."

Judge Parker, in the case referred to (People v. Warden), referring to a similar contention that had been made for upholding the act, the constitutionality of which was then before the court, said: "Nor can the contention be tolerated that because there have been in times past, dishonest persons engaged in the ticket brokerage business, with the result that frauds have been perpetrated on both travelers and transportation companies, therefore the Legislature can deprive every citizen engaged therein of the 'liberty' to further conduct such business. Stringent rules undoubtedly may be enacted to punish those who are guilty of dishonest practice in the conduct of such a business, and the machinery of the law put in motion for its rigorous enforcement; but to cut up, root and branch a business that may be honestly conducted, to the convenience of the public and the profit of the persons engaged in it, is beyond legislative power.

"If the law were otherwise, no trade, business or profession could escape destruction at the hands of the Legislature if a situation should arise that would stimulate it to exercise its power, from every field of endeavor can be found men that seek profit by fraudulent processes. Transportation tickets have been forged, it is said; so have notes, checks and bank bills. Railroad companies are no more bound to honor forged tickets than the alleged maker of a forged

note is bound to pay it. An innocent person who suffers by parting with his money on a forged ticket has his remedy against the vendor just the same as has the bank that discounts a forged note. Such instances might be multiplied, but it would serve no good purpose, for it is well known that no business can be suggested through which the innocent parties may not be occasionally victimized. But, because of that fact, honest men can not be prevented from engaging in their chosen occupations."

As suggested by Judge Parker, stringent rules not only may be, but have been, enacted to punish those guilty of selling intoxicating liquor in local option territory. It is to be presumed that the infringement of such laws would prevent the dishonest practices referred to, but be that as it may, *honest men*, as stated by Judge Parker, *can not because of that fact be prevented from engaging in their chosen occupations.*

"But we are even more fortunate, for the differentiation between the legitimate and the illegitimate conduct of a business in its relation to the police power that we have pointed out above was expressly recognized by this court in the case of Hirshfield v. City of Dallas, 15 S. W. Rep., 124. The court, referring to the abuses which might flow from the occupation of a railway ticket broker or scalper, quoted with approval the language of Tiedeman, in which the author criticises the decision of the court of Pennsylvania, holding a law constitutional which prohibited the sale of railroad tickets except by the agents of a railway company, the court having committed the error of basing its decision on the ground that such a law would have a tendency to prevent fraud upon the railroads and upon purchasers. This court held that, however much the occupation might be abused by dishonest men, it was not injurious to the public per se, and that this being the only consideration, and the tax being prohibitive, the regulation could not be upheld as an exertion of the police power, and was void.

"With any confusion of ideas that might exist removed, that this Act might be within the police power of the State on account of the fact that the business taxed by it might be dishonestly conducted we approach now a consideration of the question propounded, viz., whether the prohibition of the business of selling nonintoxicating malt liquors is within the police powers of the Legislature. Every consideration of the question must be made from the standpoint that the business is honestly conducted, and what we shall have to say hereafter will be upon the assumption that the business is viewed in this light. By police power is meant the authority of the Legislature to enact those laws which it deems essential for the safety, health, morals or convenience of the people. Whether the Act is directed towards the accomplishment of one of these ends or whether it bears any reasonable relation toward the accomplishment of such an end, are questions for the judiciary to determine. Whether it is

wise or expedient, assuming that its legitimate purpose is to accomplish one of these ends, is for the Legislature to determine. In other words, what is within the police power is a judicial question. The manner in which this power shall be exerted, is for legislative determination. It would seem that we should have to go no further than the Act itself to ascertain that even the Legislature did not construe it to be an attempt to exert police power. It carries with it no regulation of the business to which it refers nor does it provide for any safeguard or protection from an illegitimate or unlawful pursuit of the business. It merely lays the tax and does nothing more. The Act of the Thirty-First Legislature differs as to its general form in no respect from that of the Thirtieth Legislature, and the latter Act was expressly decided by Judge Ramsey not to be a police regulation.

But assuming that it was the intention of the Legislature, notwithstanding the form of the Act to make of it the means of prohibiting altogether the sale of nonintoxicating malt liquors, can the Act be upheld as an exertion of the police power?

It was just stated the expediency of legislating on a given subject is a matter for the Legislature to determine, but the power of the Legislature to so legislate is a question to be determined by the courts. If the mere fact that the Legislature by assuming to exercise a given power precluded courts from an inquiry into the existence of the power, then the Legislature would be its own judge of the limits of its power, and the rights that are secured by written constitution would be lost.

"It must, of course, be conceded that there is a limit to the valid exercise of the police power by the State. There is no dispute concerning this general proposition. Otherwise the Fourteenth Amendment would have no efficacy and the Legislatures of the State would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, health or safety of the people, such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretense—become another and delusive name for the supreme sovereignty of the State to be exercised free from constitutional restraint. This is not contended for. In every case that comes before this court, therefore, where legislation of this character is concerned and where the protection of the Federal Constitution is sought, the question necessarily arises, Is this a fair, reasonable and appropriate exercise of the police power of the State, or is it an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family? Of course the liberty of contract relating to labor includes

Vol. LXIV Crim.—25.

both parties to it. The one has as much right to purchase as the other to sell labor. This is not substituting the judgment of the court for that of the Legislature. If the Act be within the power of the State, it is valid, although the judgment of the court might be totally opposed to the enactment of such a law. But the question would still remain: Is it within the police powers of the State? *and that question must be answered by the court."*

"This was the language of Mr. Justice Peckham in delivering the opinion in the case of Lochner v. New York.

"In re Aubry, 78 Pac., 900, the Supreme Court of Washington says: 'It may be stated as a general principle of law that it is the province of the Legislature to determine whether the conditions exist which warrant the exercise of this power; but the question what are the subjects of its exercise is clearly a judicial question.'

"In no case is there a clearer enunciation of the principles upon which a just decision of this application rests, than in the case of In re Jacobs, 98 N. Y., 98, a case where a law entitled: 'An Act to improve the public health by prohibiting the manufacture of cigars, and the preparation of tobacco in any form in tenement houses in certain cases,' etc., was held unconstitutional, upon the point that it is ultimately a question for the determination of the court whether the Act is truly one within the police powers, the court says: 'These citations are sufficient to show that the police power is not without limitations, and that in its exercise the Legislature must respect the great fundamental rights guaranteed by the Constitution. If this were otherwise the power of the Legislature would be practically without limitation. In the assumed exercise of the police power in the interest of the health, the welfare, or the safety of the public, every right of the citizen might be invaded and every constitutional barrier swept away.

"Generally it is for the Legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended convenient and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property can not be arbitrarily invaded and the determination of the Legislature is not final or conclusive. If it passes an Act ostensibly for the public health, and thereby destroys or takes away the property of a citizen or interferes with his personal liberty, then it is for the courts to scrutinize the Act and see whether it really relates to and is convenient and appropriate to promote the public health. It matters not that the Legislature may in the title to the Act, or in its body, declare that it is intended for the improvement of the public health. Such a declaration does not conclude the courts, and they must yet determine the fact declared and enforce the supreme law."

The Supreme Court of Illinois in the case of People v. Steel, on the same point, says (83 N. E. Rep., 236): "While the legislation may determine when the exigency exists for the exercise of the police power, it is for the courts to determine what are the subjects for the exercise of this power, and it is necessary that the Act should have some reasonable relation to the subject of such power."

"The question is then before this court, 'Is the prohibition of the occupation of selling nonintoxicating malt liquors which are admitted to be harmless and not deleterious to health, within the scope of the police power? In order that an Act otherwise unconstitutional should be sustained upon this ground, it must appear not only that it was passed for the purpose of conserving the safety, health, morals or convenience of the people, but also that it bear some reasonable relation towards the accomplishment of this purpose. 'The mere assertion,' says Mr. Justice Peckham in the opinion quoted from, 'that the subject relates, though but in a remote degree, to the public health, does not necessarily render the enactment valid. The Act must have a more direct relation as a means to an end, and the end itself must be appropriate and legitimate before an Act can be held to be valid which interferes with the general right of an individual to be free in his person and in his power to contract in relation to his own labor.'"

Assuming that the business is honestly conducted, in what way can it be said that the prohibition of the sale of a beverage that is harmless and not deleterious to health is conducive to the safety or health or morals or convenience of the people? It is not sufficient that the Legislature may have assumed that it was (if in fact the Legislature did do so). It must reasonably appear to the court to be the case. Might the Legislature not, with as much show of reason, have suppressed the sale of another drink the people are accustomed to taking? Is there an instance anywhere where the courts have sustained an interference by the Legislature with the occupation of a citizen, so little calculated in itself to be injurious to his fellow man as in this case? If such a law could be sustained, bearing as it does, no relation to those ends for the accomplishment of which the police power is entrusted to the Legislature, then indeed is the power of the Legislature supreme and those constitutional safeguards which have heretofore protected the citizens in the continuance of those lawful pursuits which they have selected as a means of livelihood and form a part of their civil liberty are broken down and the continuance of such pursuits must be dependent upon the temper of the particular majority in power at the time. Then would it be true that ours had become a government of men and not of laws. If the court should hold that the Legislature had the power to prohibit the pursuit of this occupation, what occupation would be protected? That this one may be abused is as we have seen immaterial to the discussion Judge Parker in the case quoted above says.

"Only one prop remains which it is pretended can support the weight of this statute, and that is, that the penal laws not having proved sufficiently efficacious to wholly prevent fraud, an emergency is presented which justifies the taking away from the general public the right to engage in the business of ticket selling. It is not contended that the business of ticket brokerage is in itself of a fraudulent character. The business can be honestly conducted; it has been so conducted in the past by honest men engaged in it, and the most that is asserted is that there are some men engaged in the business who have imposed on the public. The same assertion can be made with equal truth of every business, trade or profession. Because some coal dealers and vendors in sugar cheat in weight, and dealers in paints and oil in measurement, and in tobacco in quality, it has not hitherto, we venture to say, been thought the proper remedy to make it a felony for persons to hereafter engage in such business unless they shall have been duly appointed as agents by the corporations manufacturing or producing the product."

"What occupation, we repeat, would be protected? We feel therefore that we are justified in saying, as said at the outset, that rarely has it happened that this court has had before it for consideration an Act, the sustaining of which would involve greater danger to those safeguards of civil liberty under which civilization has advanced."

In the case of the People v. Marx, the Act, the constitutionality of which was before the court, was in part as follows: "6. No person shall manufacture out of any oleaginous substance, or any compound of the same, other than that produced from unadulterated milk or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk or cream of the same, or shall sell or offer to sell the same as an article of food. This provision shall not apply to pure skim milk cheese produced from pure skim milk."

After quoting the language of Earl, J., in Re Jacobs, to the effect that the liberty of the citizen which is protected by the Constitution includes the right not only of freedom from servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways to live and work where he will, to earn his livelihood in any lawful calling and to pursue any lawful trade or avocation, the court says: "Who will have the temerity to say that these constitutional principles are not violated by an enactment which absolutely prohibits an important branch of industry for the sole reason that it competes with another, and may reduce the price of an article of food for the human race?

"Measures of this kind are dangerous even to their promoters. If the argument of the respondent in support of the absolute power of the Legislature to prohibit one branch of industry for the purpose of protecting another with which it competes can be sustained, why

could not the oleomargarine manufacturers, should they obtain sufficient power to influence or control the legislative councils, prohibit the manufacture or sale of dairy products? Would arguments then be found wanting to demonstrate the invalidity under the Constitution of such an Act? The principle is the same in both cases. The numbers engaged upon each side of the controversy can not influence the question here. Equal rights to all are what are intended to be secured by the establishment of constitutional limits to legislative power, and impartial tribunals to enforce them." The Act was held unconstitutional.

"The People v. Steel, 83 N. E., 236, was an appeal from a conviction for violating an ordinance forbidding one from selling a theatre ticket not having printed thereon, 'This ticket can not be sold for more than the price printed hereon,' forbidding the sale of such a ticket for more than the advertised or printed rate thereof and forbidding the establishment of an agency for the sale of tickets at a greater price than that asked at the box office. The enforcement of the ordinance was resisted on the ground that it contravened that section of the Constitution declaring that 'no person shall be deprived of life, liberty or property without due process of law.'" The ordinance was held unconstitutional. The opinion is an exhaustive one, citing and quoting at length from many authorities from which we have quoted.

The following quoted in the opinion from the Supreme Court of California in Ex parte Quarg, 149 California, 79, 84 Pac., 766, may be repeated here with interest: "The police power is broad in its scope; but it is subject to the just limitation that it extends only to such measures as are reasonable in their application and which tend in some appreciable degree to promote, protect, or preserve, the public health, morals or safety, or the general welfare. The prohibition of an Act which the court can clearly see has no tendency to affect, injure or endanger the public in any of these particulars and which is entirely innocent in character is an act beyond the pale of this limitation, and it is therefore not a legitimate exercise of police power. The sale of a theatre ticket at any advance upon the original purchase price, or the business of reselling such tickets at a profit is no more immoral or injurious to public welfare or convenience than is the selling of an ordinary article of merchandise at a profit."

"We have already taken advantage of the case of People v. Warden, 51 N. E., 1006, to show by the strong language of Judge Parker, who spoke for the court, that the fact that a legitimate business may be unlawfully pursued furnishes absolutely no ground for depriving citizens who intend to pursue it honestly from engaging therein. The Act was one to prevent the selling of railroad tickets except by persons authorized by a transportation company. It had been argued that such a prohibition was within the power of the Legislature because the unrestricted right to sell such tickets fur-

nished an unusual opportunity for perpetrating fraud on the public. In fact, the Act was entitled, 'Frauds in the Sale of Passage Tickets.' After demonstrating that the fact that the occupation was liable to abuse was no justification for the prohibition of it, the court then undertook to determine the question that we have here, namely, whether the prohibition of the honest pursuit of it was within the police power. The court said: 'The statute is therefore in contravention of the State Constitution, and is void unless its enactment by the Legislature constituted a valid exercise of the police power. That power is very broad and comprehensive, and has not at yet been fully described, or its extent plainly limited, but it is exercised to promote the health, comfort, safety and welfare of society. In each of the last three cases cited it was invoked by counsel to sustain a statute, and it received very careful consideration at the hands of this court. It was held that the power, however broad and extensive, is not above the Constitution, in obedience to the commands of which the courts will protect the rights of individuals from invasion under the guise of police regulations, when it is manifest that such is not the object and purpose of the regulation; and, while it is the general province of the Legislature to determine what laws and regulations are needed to protect the public health, comfort and safety, courts must be able to say, upon a perusal of the enactment, that there is some fair and reasonable connection between it and the ends above mentioned. Unless such relation exists, an enactment can not be upheld as an exercise of the police power.'" The Act was held to be unconstitutional.

"The case of The State v. Ashbrook, 55 S. W., 627, arose on the question of the constitutionality of an Act making it unlawful for persons to conduct a department store without taking out a special license and paying the special tax. The law was like the one under consideration, in that it provided no qualifications for the persons wishing to engage in the business and contained no provisions which indicated an honest intention or any intention on the part of the Legislature to regulate the business. As the court said, and as must be said of this Act, 'The applicant is simply required to pay his money and take out his license.' That is the beginning and the end of the police supervision and control over him or his business so far as concerned the Act in question. In order to sustain legislation of the character of the Act in question as a police measure, the courts must be able to see that its object to some degree tends towards the prevention of some offense or manifest fault or has for its aim the preservation of the public health, morals, safety or welfare. If no such object is discernible, but the mere guise and masquerade of public control under the name of 'An Act to regulate business and trade,' etc., is adopted, that the liberty and property rights of citizens may be invaded, the court will strike down the Act as unwarranted. Mere legislative assumption of the right to direct

and indicate the channel and course into which the private energies of the citizens shall flow or the attempt to abridge or hamper his right to pursue any lawful calling or avocation which he may choose without unreasonable regulation or molestation, have ever been condemned in all free government." The Act was held unconstitutional.

"The suppression in liquor traffic in local option territory is a matter that the Legislature is free to deal with and rigorous laws have been passed to this end. If any more are needed, it is within the power of the Legislature to enact them. The Act limiting the hours of labor of bakers passed by the New York Assembly was before the Supreme Court of the United States in the case of Lochner v. New York, 198 U. S., 45, and the argument was made in support of the contention that it was within the police power of the State, that the law tended to conserve the public health, but he court held that this was untenable, saying that all the State could properly do in this regard had been done by it in other sections of the Act; that these sections provided for the inspection of the premises, for furnishing proper washrooms and water closets, etc. The court held that the part of the Act limiting hours of work bore no reasonable relation towards the accomplishment of any of the ends for which the police is recognized to exist, but on the contrary characterized such statutes as 'mere meddlesome interference with the rights of the individuals.'

"It was sought in the case of Richie v. The People (Supreme Court of Illinois), 40 N. E. Rep., 454, to uphold the Act of the Legislature limiting the hours of work of females on the ground that woman on account of her sex required such protection and that the Act as designed for this purpose and was within the police power of the State, but the court held that females were citizens of the State as were the males and that their constitutional right to freely contract for their labor could not be interfered with. The court held there was no reasonable relation between the Act and the end sought to be accomplished and held it unconstitutional.

"In the case of Wyeth v. Thomas, 83 N. E. Rep., 925, which was decided by the Supreme Court of Massachusetts this year, a rule was passed by the Board of Health which in effect provided that no person should follow the business of an undertaker who was not a registered embalmer. Again, it was sought to uphold the Act upon the ground that it was a police regulation, but the court held otherwise, quoting from Lochner v. New York, 'The mere assertion that the subject relates though but in a remote degree to the public health does not render the enactment valid. The Act must have a more direct relation as a means to an end and the end itself must be appropriate and legitimate before an Act can be held to be valid which interferes with the general right of an individual to be free in his person and in his power to contract in relation to his own labor.' "

It was sought in the State of Washington to uphold an Act making it a crime to engage in the business of plumbing without first having obtained a license as required by the statute on the ground that good plumbing or bad plumbing bore directly and intimately upon the public health and that the regulation of the business therefore fell within the police power of the State. The case is authority here as showing that there must be some real and substantial relation between the Act and the preservation of the safety, morals or health of the people and not a merely fanciful one. The court held that there was no such substantial relation in the case of this Act and held the Act unconstitutional. If the preservation of health from defective plumbing required an Act of the Legislature, such an Act might be passed. The Act in question, however, was held not to be reasonably calculated to accomplish the purpose. The court quoted the language of Mr. Justice Peckham in the case of Lochner v. New York. "There must be more than the mere fact of the possible existence of some small amount of unhealthfulness to warrant legislative interference with liberty." The case referred to is Richie v. Smith, 84 Pac., 851.

The city of Macon passed an ordinance levying a tax on persons engaged in lending money on household or kitchen furniture and wearing apparel. The tax was so high as to be prohibitive. It was held that the power given the municipal corporation to levy taxes did not include power to impose upon a legitimate business a tax so high as to render it impossible to pay the same and carry on the business profitably. While the question before the court was the extent of the power which had been granted to the city, the following portion of the opinion of Chief Justice Horton in Lyons v. Cooper, 39 Kansas, 324, is pertinent here. "Where the grant is not made for revenue alone, but for regulation also and the business is one that does not injuriously affect the public interests or lead to disorder or to increase necessity for police supervision like the sale of intoxicating drinks as a beverage, the license fee, while somewhat within the discretion of the mayor and the council, ought not and can not be so excessive as to prohibit and destroy a business carried on for necessary purposes." The case is reported under the style of Morton v. Macon, 50 L. R. A., 485.

The State of Wisconsin passed a law which, if held valid, would give the occupant of the lower berth in a sleeping car the option of having the upper berth closed if unoccupied. The Act just as the one before us, the like of which no Legislature so far as our search has been able to disclose has ever passed, might well be called one of those "experimental laws" which are referred to in the decision of the case in which the Act was held to be unconstitutional. State v. Redmon, 114 N. W., 137.

It was claimed that the Act was valid as being a proper exertion of the police power for the health of the people. The court said:

"It is not every enactment which will to some extent promote the public health, comfort or convenience which is legitimate. Otherwise the way would be open for legislative interference with the ordinary affairs of life to an extent destructive of many of the most valuable purposes of civil government."

The court then gives an illustration of the extreme length to which an expert on sanitation might reasonably go in providing rules of health for long and enjoyable life. The court then says: "That such an extreme would be regulation run mad is quite improbable 'tis true, but it would be possible without limitations of some sort, if a police law be conclusively legitimate merely because it promotes, however trifling in degree, public health, comfort or convenience.

"Illustrating the matter was above in Ex parte Jentzsch, 112 Cal., 468-472, 44 Pac., 803, 804, 32 L. R. A., 664, the court said: 'The spirit of such a system such as ours is, therefore, at total variance with that which, more or less veiled, still shows in the paternalism of other nations. It may be injurious to health to eat bread before it is twenty-four hours old, yet it would strike us with surprise to see the Legislature making a crime of the sale of fresh bread. So, while the police power is one whose proper use makes most potently for good, in its undefined scope an inordinate exercise lurks no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds, affords a temptation to the Legislature to encroach upon the rights of the citizens with experimental laws, none the less dangerous because well meant.'

"The doctrine that the police power is really a law of necessity forms the key, it would seem, with which to unlock the mysteries, so far as practicable, of what is within and what is without the limits of such power. Not that a police regulation in form or pretense, to be one in fact must supply some absolute essential to the public welfare, but that the exigency to be met must so concern such welfare, be sufficiently vital thereto, as to suggest some reasonable necessity for a remedy affordable only by a legislative enactment, as to efficiently invite public attention thereto, it being regarded as a legislative function to primarily pass upon the matter. No more definite rule can be well worked out except as it may be evolved by the process of inclusion and exclusion in the treatment of cases as they arise."

Bonnett v. Vallier, cited, involving the constitutionality of an Act regulating construction of tenement houses was held not to be within the police power of the State and being otherwise invalid was declared unconstitutional.

In the case of State v. Williams in the Supreme Court of North Carolina, 61 S. E., 61, an Act which forbade the mere bringing into a county of more than a half a gallon of intoxicating liquors was held to be unconstitutional and that the purpose of the Act

when sought to be defined as the exertion of the police power could not be reasonably said to bear any clear, reasonable or substantial connection to the objects of that power.

In Tiedeman on Sales, section 101, it is said: "In order to justify a restrictive license the business must itself be of such a nature that its prosecution will do damage to the public whatever may be the character and qualifications of those who engage in it."

Certainly it is clear that the sale of a nonintoxicating drink which is the antithesis of the intoxicating drink by its very definition can not be said to be one such that the business of selling it will do damage to the public "whatever may be the character or qualifications of those engaged in it."

But much that we have said might well have been omitted because to this court it is but to travel over again well beaten paths. The cases of Hirshfield v. The City of Dallas, 15 S. W., 124; Ex parte Wood, 52 Texas Crim. Rep., 575, 108 S. W. Rep., 1171; Owens v. The State, 53 Texas Crim. Rep., 105, 112 S. W. Rep., 1075; and Ex parte Brown, 38 Texas Crim. Rep., 295, 42 S. W. Rep., 554, contain a clear and unqualified enunciation of all the principles which have been set forth above and supported by the authorities and no further citation than of these cases it seems to us is necessary to demonstrate that this experimental law bears no relation to a proper safeguard or preservation of the safety, health, morals or convenience of the people, but is merely the result of the caprice of a "legislative majority," such as was in the mind of Mr. Justice Peckham and from an arbitrary interference by which written Constitutions were ordained and established.

Nothing is more important that we could say in helping the court arrive at a correct conclusion as to the constitutionality of this Act than that it is not to be considered as applying to local option territory only. We hope we have established thoroughly that because in the past the selling of nonintoxicating drinks has in some places been made the cloak and shield for violating local option laws furnishes no reason why a citizen who desires to pursue the occupation lawfully in that territory should be deprived of his constitutional right to do so, but what we would have the court bear in mind is that this Act is not limited in its operation to that territory alone, but applies as well in those parts of the State where local option is not in effect. Even here where the sale of intoxicating liquors is not prohibited and where such criticism of the Act could not possibly apply, the citizen is, because of the enormity of the tax, deprived of the opportunity of pursuing this vocation.

"II.   The Act is void and unconstitutional because in conflict with sec. 2, art. 8, of the Constitution, in that the tax is not equal and uniform within the meaning of the Constitution and is class legislation.

Pullman Palace Car Co. v. State, 64 Texas, 274; Ex parte Jones,

43 S. W. Rep., 513; Ex parte Overstreet, 46 S. W. Rep., 825; Rainey v. State, 53 S. W. Rep., 882; Poteet v. State, 53 S. W. Rep., 869; Ex parte Woods, 52 Texas Crim. Rep., 575, 108 S. W. Rep., 1171; Owens v. State, 53 Texas Crim. Rep., 105, 112 S. W. Rep., 1075; People v. Marx, 99 N. Y., 377; Wynehamer v. People, 13 N. Y., 378; Calder v. Bull, 1st (Law) U. S., 648.

"The Act under discussion went into effect and became a law February 24, 1909. Thereafter on the —— day of July, 1909, and more than five months after the enactment of the law, under consideration, the law known as the Robertson-Fitzhugh law passed by the Thirty-First Legislature became a law. This Robertson-Fitzhugh law was designed to regulate the sale of intoxicating liquors. It covered the entire scope of the subject matter legislated upon and provided a complete system of procedure to secure license to engage in the business and to regulate the traffic in intoxicating liquors and defined intoxicating liquors. All of which was set out in the caption of the bill and incorporated in the body of the Act. This Act provided that upon a payment of $375, to the State and upon a compliance with the other provisions of the statute a man could engage in the business of a retail liquor dealer. In section 1 of the Act the Legislature fixed the tax: "For Selling Malt Liquors exclusively, $62.50."

"It will be noticed that this provision is 'For Selling Malt Liquors exclusively,' whether the same be intoxicating or nonintoxicating. Section 2 of said Act defines a retail liquor dealer and then concludes: 'Any person who sells intoxicating liquors in quantities less than one gallon shall be governed by the provisions of this law and be required to take out license hereunder.' Section 3 relates to the malt dealer exclusively. Section 4 prohibits any person from selling spirituous, or vinous liquors 'without taking out a license as a retail liquor dealer.' Section 5 prohibits any person from selling malt liquor without taking a malt liquor dealers' license, but specifically provides: 'That this section shall not apply to a retail liquor dealer and that a retail liquor dealer's license should be construed to embrace a retail malt dealer's license.' Section 34 of this Act referring to the term intoxicating liquor as used in section 2, as before stated, says: 'The term intoxicating liquor as used in this Act shall be construed to mean fermented, vinous or spirituous liquors, or any composition of which fermented vinous or spirituous liquors is a part, and all of the provisions of this Act shall be liberally construed as remedial in character.' All malt liquor is fermented.

"It is therefore perfectly patent that the very terms of this bill demonstrate the purpose of the Legislature that the Act should be coextensive with the legalized traffic in fermented, vinous or spirituous liquors, and therefore embraced the subject previously legislated upon by the Act challenged in the case at bar, clearly evidencing a purpose on the part of the Legislature either to take the retail

liquor dealer or the retail malt dealer out of the provisions of said challenged Act, *or to repeal the same*. It follows then, of course, in either case, that the relator is entitled to his discharge.

"Treating the provisions of the Robertson-Fitzhugh bill quoted along with section 34 of said bill, as an exception, it will be seen that a retail liquor dealer by paying $375.00 to the State can do what it would cost the corner groceryman $2,000 to do, to wit: To sell a nonintoxicating malt liquor. Or to restate it, the corner groceryman who keeps beer for sale which may be an intoxicant in fact, can sell Hiawatha, which it not an intoxicant in fact, by paying to the State a license tax of $62.50 a year, which his competitor across the street who may believe that it is wrong to sell beer which intoxicates and may not desire to engage in the business as a retail malt dealer and yet who may have a trade which requires malt liquors which are not intoxicating in fact, and while he may realize that it is not morally wrong to sell such liquors and may desire to do so with a view of preserving his business and supplying his trade, he either has to surrender a harmless and lawful part of his business or has to pay the discriminating tax of $2,000 a year to the State. If this court should hold that this Act is existent and valid, they would be responsible for placing a premium upon the liquor traffic, because they would say to a man you can not sell a harmless beverage, one which even is beneficial, unless you either become a retail liquor dealer or malt dealer and sell whisky or beer along with the nonintoxicating malt liquors, or you must pay the tax of $2,000.

"Every argument that is advanced by the advocates of the Act here challenged to the effect that the nonintoxicating beverage is frequently used as a fraud to aid in the illegal sale of intoxicating liquors, is met and destroyed by section 34 of the bill above quoted.

"The purpose of that section was to meet the argument such as is advanced by the advocates of the bill challenged. The Thirtieth Legislature in governing the liquor traffic defined intoxicating liquor with the sweeping definition in section 34, to take the question of intoxicating qualities of a beverage from the jury and defined intoxicating liquors in such sweeping terms that a defendant could not be heard to say after it was shown that he had sold vinous, spirituous or malt liquors, that the same were not intoxicating in fact. The Thirty-First Legislature reenacted this definition in the Robertson-Fitzhugh bill. So now if a man is indicted for selling malt liquors and the State should prove that he sold such liquors, and that the same were fermented liquors and that he had no license as a retail liquor dealer or a retail malt dealer, then he would not be permitted to introduce proof to the effect that notwithstanding said liquors were fermented, still they were not intoxicating in fact, because the statute plainly says that such liquors are intoxicating. This provision has been incorporated in the liquor laws of a great many States because of the unvarying custom that when a man was

indicted for selling intoxicating liquor without license, he always interposed the defense that the liquor was not intoxicating in fact. Of course he can deny the fact that the liquor was either vinous, spirituous or malt. But if he admits or the State establishes it, and he does not seek to contradict that the liquor is spirituous, vinous or malt, he will not be heard to say that such liquor is not intoxicating in fact. (We are not discussing the local option law and what are intoxicants under that law. The Act here mentioned is one of regulation, not of prohibition. Under the local option law in this State, the intoxicating quality of the liquor must be proved as a sine qua non to conviction. The definition of intoxicants in the Robertson-Fitzhugh law does not apply to the local option law.) Because the statute expressly says that it is. And this statute dealing with the strong subject of intoxicating liquor in fact and in law enjoys the unrestricted scope and vital force of the police power and such statutory definition is clearly a proper exercise of the police power. This being so, it was not necessary for the Legislature to enact the statute here challenged as an aid to the enforcement of the liquor traffic and the statute can not be sustained on that ground. If the subject matter of the statute is a fit subject for the operation of the police power, then it has been acted upon fully by the Robertson-Fitzhugh bill when it says: 'Any person who sells intoxicating liquors in quantities less than one gallon shall be governed by the provisions of this law, and be required to take out a license hereunder.' If it is not, on the other hand, the fit subject of operation by the police power then, of course, the statute would be void for that reason.

"Section 35 of the Robertson-Fitzhugh bill which became effective on the date as before stated, provides: 'All laws and parts of laws in conflict with this Act are hereby expressly repealed.' The Robertson-Fitzhugh bill is a proper exercise of the police power. It proceeds upon the proper theory of police regulation prescribing the qualifications of a license, setting forth the procedure to secure a license, provides for the method of operating a place where intoxicating liquors are sold, surrounds the same with legal and reasonable restrictions. The bill challenged has none of these features of police regulation. It simply stands out like a broken and dead tree in the symmetrical forest of the liquor regulatory laws of this State.

"Another irreconcilable conflict between the law challenged and the so-called Robertson-Fitzhugh law is that under the law challenged any person without let or hindrance, without qualification and without restraint may engage in the business of selling non-intoxicating liquors anywhere upon the simple payment of the license tax; whereas, under the Robertson-Fitzhugh bill, as before stated, qualifications are exacted and the number of saloons limited. So if this bill is permitted to stand instead of becoming a sword to prevent the illegal sale of intoxicating liquors, it would become

a shield to protect the illegal vendors of intoxicating liquors sold under a license procured under this statute. For instance, if a city has secured all the liquor and malt dealers' licenses to which she was entitled, and any person without such license should engage in selling nonintoxicating malt liquors, his business could be suppressed under the Robertson-Fitzhugh bill, but if he had paid a tax under the bill attacked in this proceeding then he could use such license and sell beer and other intoxicants in fraud of the revenue of the State and contrary to the plain provisions of the Robertson-Fitzhugh bill, and when called upon to answer for such illegal sale he could interpose the defense that the liquor sold by him was nonintoxicating in fact, therefore he was protected by the license issued under the Act questioned. And thus the advocates of the validity of this measure would realize so far as it is concerned that 'from the source from whence comfort seems to come, discomfort swells.'

"This bill can not and should not be construed in any sense as a prohibition or local option law. Ex parte Woods, 108 S. W., 1171. And further, because no local option law can have extra territorial force—can not be operative in wet territory. This case comes from a territory where liquors are sold under the law, and where their sale has not been prohibited, and in the case at bar should not for a moment be construed as such local option or prohibition statute.

"Under the principles asserted and the authorities cited, we respectfully submit that the relator is entitled to be discharged.

Respectfully submitted,

J. B. Bisland,
Baker, Botts, Parker & Garwood,
McGregor & Gaines,
Attorneys for relator."

Jesse Andrews,
    of Counsel.

Adopting this brief as my dissenting opinion, I wish to say my brethren have not even measurably met the case as presented in the argument of applicant's counsel, and the questions therein discussed. There is much said in the prevailing opinion which seems to have no particular bearing on the issues involved. These I do not care to notice. What has been said therein will pass into history as evidence of the strenuosity of present day environments. It is doubtless of little use to dissent. At present it will avail but little. Its practical value is to be looked for in the future, and I write this dissent as I have written others, feeling it to be for the present unavailing, but yet I do so with the hope born of abiding faith that at some time, not far distant, there will be a return to correct legal principles and sound jurisprudence—a home-coming to the guaranties of liberty sought to be established by the fathers and perpetuated in our constitutional form of government.